REVISED SEPTEMBER 16, 2002

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-51112
Consolidated with No. 01-50479
_____

DONALD RAY TYLER; DONALD R. POWERS;
M. LEON EARLES; THOMAS L. HOUGH;
DAVID BURKETT,

        Plaintiffs-Appellees-Cross-Appellants,

JESSIE G. PRICE,

        Plaintiff-Appellant,

    versus

UNION OIL COMPANY OF CALIFORNIA,
doing business as UNOCAL,

        Defendant-Appellant-Cross-Appellee-Appellee.

-----------------------

DONALD RAY TYLER; DONALD R. POWERS;
JESSIE G. PRICE; M. LEON EARLES;
THOMAS L. HOUGH; DAVID L. BURKETT,

        Plaintiffs-Appellees-Cross-Appellants,

    versus

UNION OIL COMPANY OF CALIFORNIA,
doing business as UNOCAL,

Appeals from the United States District Court
for the Western District of Texas

August 27, 2002

Before KING, Chief Judge and GARWOOD and HIGGINBOTHAM, Circuit Judges.

GARWOOD, Circuit Judge:

These appeals and cross-appeals bring before us a variety of issues in this suit under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 et seq., and the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201 et seq.

The plaintiffs, former employees of Union Oil Company of California (Unocal), filed this suit against Unocal on March 19, 1998, alleging violations of the ADEA and the FLSA. A jury trial was held on the ADEA claims. On December 12, 1999, the jury returned a verdict in favor of all plaintiffs on their ADEA claims. Beginning on December 12, 1999, a bench trial was held on the FLSA claims. On September 19, 2000, the district court granted in part and denied in part Unocal's motion for judgment as a matter of law (JMOL) on the ADEA claims. The court set aside the verdict in favor of plaintiff Jessie G. Price (Price) and rendered judgment for Unocal on Price's claims. It upheld the liability verdicts in favor of each of the other plaintiffs, but lowered the jury's

2

damage awards. Also on September 19, 2000, the district court issued its ruling on the FLSA claims, ruling in favor of plaintiff Donald R. Powers (Powers) and against plaintiffs Price, M. Leon Earles (Earles), and Thomas Hough (Hough).

The plaintiffs moved for an award of attorneys' fees and expenses. On May 11, 2001, the district court granted in part and denied in part that motion.

Plaintiff Price appeals the JMOL in favor of Unocal on his ADEA claims. Unocal appeals the judgments in favor of plaintiffs Donald Ray Tyler (Tyler), Powers, Earles, Hough, and David Burkett (Burkett) on their ADEA claims. Plaintiffs Tyler, Powers, Earles, Hough, and Burkett cross-appeal the damage award and the judgment against Earles and Hough on their FLSA claims. Unocal filed a separate appeal contesting the award of attorneys' fees and costs. Plaintiffs cross-appealed the amount of the fees and costs award. The fees and costs appeal has been consolidated with the appeals on the merits.

We affirm in part. We vacate and remand as to the amount of liquidated damages.

## Facts and Proceedings Below

For clarity, this section is divided into sub-sections, some presenting facts generally relevant to the entire case, others specific to particular plaintiffs or issues. Also for clarity, the following designations are used hereinafter: The Appellees

will refer collectively to all the plaintiffs except Price (who was the only plaintiff to lose on all his claims at trial). The Plaintiffs will refer collectively to all the plaintiffs, including Price.

1. General Background Facts

In late 1996, Unocal, an oil company, began a reorganization of its domestic operations in the lower forty-eight states. The reorganization resulted in a new business unit, Spirit Energy 76 (Spirit). The reorganization involved a reduction in force (RIF) plan. Under the RIF, employees who did not get positions in Spirit were eligible to be placed in a "redeployment pool" (the pool), from which Unocal could choose employees for available jobs. Employees who were laid off and placed in the pool received, in addition to other benefits, salary for up to four months, depending on length of service. The Plaintiffs were eligible to receive redeployment benefits and remain on Unocal's payroll until April 30, 1997. Employees could also opt to participate in Unocal's Termination Allowance Plan (TAP), which provided termination pay for employees displaced by the RIF in exchange for signing a release that purported to waive permanently all potential claims against Unocal relating to the adverse employment decision.

At the time of the RIF, the Plaintiffs were Unocal employees in the Permian Basin region in West Texas. Their positions, ages

4

at the time of the RIF, and their years of service at Unocal were as follows:  Price: Production Foreman over the Moss Unit, age fifty-five, thirty-three years;  Hough: Health, Environment & Safety (HES) Coordinator in Andrews, age fifty-five, twenty-four years; Earles: Production Technician in Andrews, age fifty-three, twenty-two years; Burkett: Senior General Clerk in Midland, age fifty-five, thirty-seven years; Powers: Production Clerk in Andrews, age fifty-five, thirty-four years; Tyler: Field Superintendent, age fifty-five, twenty-seven years.

The Appellees all ended their job assignments with Unocal on December 31, 1996.  Price ended his assignment on January 15, 1997.  Tyler and Hough were officially terminated on January 31, 1997.  Burkett, Earles, Powers, and Price remained on the payroll until April 30, 1997.  Each plaintiff participated in the TAP and, after signing the required releases, received termination pay.

Jack Schanck, age forty-five, was made president of Spirit. As part of their attempt to show discriminatory animus, the Plaintiffs produced, *inter alia*, a memorandum from Schanck, dated March 14, 1996, which contained the following:

> "Keep in mind that although you may consider that less
> experienced employees may not currently have as much of
> an impact on the company as those at higher T C P
> levels, their performance may actually be superior, and
> they may have greater technical potential."

This memorandum was issued to managers and directed the forced

ranking of employees prior to the RIF.  The Plaintiffs also pointed to excerpts from a letter written by Schanck to all employees in August 1996 which stated that Spirit Energy would be a "lean, quick-reacting organization" that would "not be constrained by an old Unocal way."

The Plaintiffs produced a Unocal policy manual that advised employees conducting a reorganization to ensure that plans "minimize the risk that personnel decisions can be viewed as being illegal employment discrimination" and that stressed the need to document non-discriminatory reasons for personnel decisions.  In connection with the 1996 reorganization, Larry Love, a Senior Resources Consultant at Unocal, prepared an adverse impact study of the proposed RIF (the Love analysis). The Love analysis showed that there was a possibility the RIF would have an adverse impact correlated with age.  Love submitted his analysis to Vice President of Human Resources Peter Vincent.

2. Equitable Estoppel Issue Facts

Texas is a "deferral" state (i.e., a state with a state law prohibiting age discrimination in employment and a state authority to grant or seek relief from such discriminatory practice, 29 U.S.C. §§ 626(d) and 633(b)).  *Conaway v. Control Data Corp.*, 955 F.2d 358, 363 & n.3 (5th Cir. 1992).  Under the ADEA, in a deferral state the limitations period for filing an age discrimination charge with the EEOC is effectively 300 days.

6

29 U.S.C. § 626(d). Thus, a Texas employee's ADEA claims are normally time-barred if the employee fails to file an age discrimination charge with the EEOC within 300 days from the date of the unlawful employment practice. Plaintiffs Tyler, Powers, Price, Earles, and Hough filed their EEOC claims on March 9, 1998; Burkett filed his on March 13, 1998. The EEOC issued the Plaintiffs notices of right to sue on March 19, 1998, and the Plaintiffs filed their complaint on the same day. The Plaintiffs do not dispute that their EEOC claims were filed outside the applicable 300 day window. The district court held that equitable estoppel barred Unocal from asserting a limitations defense. The district court had previously denied earlier (pre-verdict) motions by Unocal to dismiss the Plaintiffs' claims as time-barred.

The Plaintiffs testified that they believed they had signed away all potential claims and rights under the ADEA when they signed their release forms. Each of the Plaintiffs had signed a release form purporting to discharge Unocal from "all claims, liabilities, demands and causes of action" related directly or indirectly to the termination of employment. Hough signed an older version of the form that did not contain a specific reference to the ADEA. The other plaintiffs signed a newer version, drafted in 1996, that added a specific reference to the ADEA (the 1996 Release). In 1990, the Older Workers Benefits

7

Protection Act (OWBPA), 29 U.S.C. § 626(f), amended the ADEA. Under the OWBPA, for a release of ADEA claims to be effective, the release must meet certain requirements, including making specific mandatory disclosures. *Blakeney v. Lomas Info. Sys.*, 65 F.3d 482, 484 (5th Cir. 1995). Richard Ettensohn, an in-house attorney for Unocal and an employment law specialist, testified that he had drafted the release language and that it did not comply with the OWBPA. He admitted that the releases were not effective to release the Plaintiffs' ADEA claims. Unocal does not dispute that the releases were not effective as to ADEA claims.

Plaintiff Tyler testified that, in August or September 1997, he happened to discuss the release forms when he visited with an attorney on an unrelated matter. The attorney suggested that Plaintiffs consult with an employment attorney to determine whether the releases were valid. Plaintiffs met with an attorney to discuss the matter in early 1998 and discovered that the releases were not effective to release ADEA claims. In March 1998, on the attorney's advice, they filed their EEOC charges.

The issue whether Unocal's conduct induced the Plaintiffs to refrain from filing their claims within the 300 day window was submitted to the jury, which found in the affirmative. The district court found that the testimony given at trial was sufficient to support the jury's finding. According to the

district court's opinion in ruling on Unocal's JMOL motion, the language of the releases would have misled most laymen to believe that they had released their ADEA claims and Unocal should have "unmistakably understood" that Plaintiffs would have been so misled. Thus, the district court held that Unocal was equitably estopped from asserting the limitations defense. Unocal appeals this ruling and argues that the ADEA claims of all Plaintiffs were time barred.

3. The Plaintiffs' Statistical Evidence

At trial, the Plaintiffs offered expert statistical evidence from Dr. Blake Frank. Dr. Frank's expert testimony was presented to support an inference of motive for disparate treatment.

Dr. Frank is an industrial/organizational psychologist. He testified that his analysis showed that Unocal employees over age fifty were less likely to be promoted and more likely to be placed in the pool. Dr. Frank also testified that his analysis showed that the relationship between superior performance evaluations and retention was statistically insignificant.

Unocal challenged the admissibility of Dr. Frank's testimony in a *Daubert v. Merrell Dow Pharmaceuticals*, 113 S.Ct. 2786 (1993), motion and in a motion *in limine*. At the close of the Plaintiffs' case and again after presentation of all the evidence, Unocal made Rule 50 motions for JMOL. After the verdict was returned, Unocal filed its post-verdict JMOL motion.

The district court considered Unocal's objections and overruled them.  On appeal, Unocal challenges the court's finding that this statistical evidence was admissible.

4. Price

Price appeals the district court's holding, in its JMOL, that he did not prove that he suffered an adverse employment action.  Prior to the December 1996 RIF, Price was employed as a production foreman at Unocal's South Cowden location known as the Moss Unit.  Don Umsted, age 39, served as production foreman at the North Cowden location.  During the RIF, Unocal consolidated these two locations into a single unit with a single production foreman.  In mid-December 1996, field superintendent Diane Van Deventer, Price's supervisor, informed Price that Umsted had been chosen to be production foreman over the new combined unit.  She further informed Price that he had been reassigned to work as an HES coordinator, with the same salary and benefits.  Price had no previous formal experience in HES and asserts that he would have lost seniority and supervisory responsibility.[1]  Price expressed his dissatisfaction with the reassignment, but agreed to take the HES position.  Price testified that he was discouraged by the amount of training he needed for the new position.  After working for a few days, he resigned and asked for the redeployment

_____

[1]In his brief, Price also asserts that he would have lost salary in the new position.  But Price testified that he was told his salary would remain the same.

10

package.  On his unemployment compensation form, Price noted that he "quit – I volunteered for a package and was accepted."  Price testified that he viewed the reassignment as a deliberate attempt to humiliate him into quitting.

Price produced evidence that, as production foreman, he had received positive evaluations from his supervisors, including Van Deventer.  The decision to name Umsted as the production foreman for the new combined unit was made by D.J. Ponville, Unocal's new Onshore Operations Manager, with input from Van Deventer.  In November 1996, Ponville had chaired a meeting with field superintendents Van Deventer, Craig Van Horn, and Greg Leyendecker to discuss filling positions, including production foreman positions.  Ponville and other Unocal decision-makers testified that they made personnel decisions on factors other than age.  There was testimony that Van Deventer had made age-related remarks to Price and others on several occasions.[2] Evidence at trial, including Van Deventer's own testimony, indicated that Van Deventer was heavily involved in personnel

---

[2]Plaintiff Earles testified that Van Deventer told him, in the mid 1990s, that "she didn't think that anyone would be able to retire with Unocal at that point in time" and that he understood this to mean that Unocal would push senior employees into early retirement.  Earles also testified that Van Deventer often referred to Price as "the old man" or a "senior citizen" and that she had referred to "the geriatric group".  Price also testified that she had referred to him as "the old man."  Powers testified that, when he asked Van Deventer whether she would be the office boss after the reorganization, she replied "You old son-of-a-bitch, your ass will be gone before that ever happens."

11

decisions.

With regard to Price, the district court found that it did not need to consider Price's evidence of discriminatory intent because Price had not suffered an adverse employment action. He was not discharged. He was transferred to a different position with the same salary and benefits and then voluntarily decided to resign rather than learn new skills. The district court found that Price's reassignment was the sort of business decision, typical in a reorganization, that the courts will not second guess.

5. Hough

In the district court, Unocal asserted that plaintiff Hough did not suffer an adverse employment action and that he voluntarily elected to leave Unocal. Unocal argued that Hough was offered a job and declined it. Hough argued that any offer made to him was so vague and uncertain that it did not qualify as a real job offer.

Hough was the Health, Environment, & Safety (HES) coordinator in South Andrews. Hough testified that, on the morning of December 11, 1996, field superintendent Van Horn came to his office "to tell me that I would have a job with Unocal but it would no longer be in HES." Van Horn told Hough that he was uncertain as to what the job would be, how much it would pay, or where it would be located. Van Horn said it was likely that it

12

would be some type of technician job in Midland and pay less than Hough was earning as an HES coordinator. Van Horn requested a decision by noon that day, but extended the deadline to two o'clock p.m. That morning, Hough conferred with Steve Gregory, the head of HES at Unocal, about the availability of other HES positions. Gregory informed him that none were available at that time, but he would be notified if one became available. Hough testified that he ultimately declined Van Horn's offer because of the uncertainty regarding what the job, salary, and location would be. Hough was also concerned about losing a significant percentage of his retirement if he accepted the new position. Hough took the redeployment package instead. Hough further testified that he felt he should have been offered the HES position that opened when Price left and that his former duties were assigned to a person he considered less qualified than himself.

The district court found that there was sufficient evidence to permit the jury to find that Van Horn did not actually make a firm employment offer to Hough.

6. Earles

Unocal asserted that plaintiff Earles also declined an offer of employment and thus did not suffer an adverse employment action.

Earles was a production technician. On November 19, 1996,

13

Van Deventer notified Earles, by letter, that he was being placed in the redeployment pool. The letter stated that he might still be offered a position, but that his continued employment was doubtful. It said that Earles would be notified of a final decision by December 20, 1996.

Earles testified that, at that time, he asked Van Deventer if she knew of any available positions and she said that she did not. Earles spoke to Gary Dupriest, the South Permian Asset Manager, and told Dupriest that he had an offer from another company. Earles asked Dupriest to level with him about his chances of being offered another position at Unocal and Dupriest advised him to try to find something outside of Unocal.

Later, Van Horn contacted Earles by telephone. Earles and Van Horn offered conflicting testimony about the conversation. Earles testified that Van Horn told him "That he didn't really have anything to offer me, but if there was a job, and he wasn't sure what it was going to be . . . it might be HES." According to Earles, Van Horn further said that any possible job would "almost certainly involve some salary compression" and Van Horn asked Earles if he would have any interest. Van Horn demanded an answer before he hung up the telephone. Van Horn testified that he did not want to make Earles ineligible for retirement benefits by making him a formal offer of employment before knowing whether Earles was interested in the new position, so he contacted Earles

14

to gauge his interest. Van Horn testified that he told Earles that an HES position was being vacated by Hough in Andrews and Van Horn asked Earles if he would be interested in the position if it were offered to him. Van Horn testified that Earles asked only what the job entailed and where he would be located, and did not inquire into the salary. According to Van Horn, Earles told him that he had a foreman position with another oil company and that he was not interested in the Unocal HES job. Van Horn reported to Ponville that he did not extend a formal employment offer to Earles because Earles was not interested in the possible offer.

The district court determined that, since several witnesses testified almost no one was hired out of the redeployment pool, sufficient evidence was presented to allow the jury to conclude that placement in the pool constituted a discharge. Unocal does not challenge that determination. The court concluded that the jury could find that the phone call from Van Horn did not constitute a true offer of employment and that Earles, for all practical purposes, was terminated by being placed in the pool against his will.

7. Burkett

Unocal asserts that Burkett was terminated because of a good faith mistake, not because of age discrimination.

Burkett was a senior general clerk in Midland with thirty-

15

seven years of experience at Unocal. In December 1996, Burkett was given the redeployment package. Unocal does not dispute that Burkett suffered an adverse employment action, but argues that Ponville had a mistaken belief that Burkett wanted the package rather than reassignment. Burkett contends that he made it clear to Ponville and other decision-makers that he wanted any job in the new Unocal organization.

Burkett testified that, in November 1996, Ponville held a meeting of the clerical staff and told them that the RIF would reduce the number of clerical jobs in the organization. According to Burkett, Burkett then approached Van Deventer and told her that he would take any clerical position that was available. On December 11, Ponville gave Burkett a redeployment package. Burkett testified that he met with Dupriest after he received the package and told him that he needed a job and would take any position available. Ponville, Dupriest, and Van Deventer all testified that they thought Burkett wanted the package rather than reassignment.

Before December 11, Unocal had offered a clerical position to Tammy Kennedy, who turned it down. According to Burkett, Unocal never offered this position to Burkett or to co-plaintiff Powers. Burkett presented evidence that Unocal had retained four younger employees with less experience in the Permian Basin area – Tamara Powers (age 37), Amanda Armstrong (24), and Tina Carter

16

(31).  The district court determined that this evidence was not probative of age discrimination because, although these employees were clearly younger and less experienced, there was insufficient evidence that they were actually less qualified that Burkett. Nevertheless, the court held that Burkett had presented sufficient evidence that Unocal's mistake defense was a mere pretext for discrimination.

8. Damages

The district court reduced the back pay damages awarded by the jury.  The jury had not reduced the gross back pay amount awarded by the amount of the interim wages that the Appellees had earned since their employment with Unocal ended.  The Appellees conceded that this adjustment was appropriate and required by law.  The district court denied Unocal's request to offset the damage awards by the amount of the termination allowances that the Appellees received in exchange for signing the releases. Unocal does not challenge that holding on appeal.

The district court entered final judgment on September 19, 2000.  The court extended the back pay period from the date the verdict was returned – December 21, 1999 – to May 25, 2000.  As of May 25, Unocal and Spirit ceased to exist in the Permian Basin.  Unocal's Permian Basin assets were sold as part of a transaction that resulted in the creation of a new company, Pure Energy Resources, Inc. (Pure).  Unocal terminated all of its

17

employees in the region on or before May 25, 2000. According to Unocal, approximately thirty percent of those terminated were not hired into Pure. Unocal admitted that it was possible that some or all of the Plaintiffs would have been hired by Pure if they had still been employed by Unocal. The Appellees note that Unocal owns sixty-five percent of Pure and controls its board of directors. The district court held a hearing and heard evidence regarding the cessation of Unocal's operations and the creation of Pure. The district court held that, because the Appellees would have been terminated by Unocal by May 25, that date was the appropriate cut-off date for the extension of back pay awards. The Appellees challenge this holding on appeal.

The district court denied the Appellees' request for front pay awards. Reinstatement was not a feasible remedy since some of the Appellees' positions were eliminated during the RIF and the rest were eliminated when Unocal ceased operations in the Permian Basin on May 25, 2000. Thus, the district court found, any front pay award would be purely speculative and require the court to guess whether each plaintiff would have been hired by Pure. The Appellees appeal the denial of front pay.

The district court awarded each of the Appellees $2,500 in liquidated damages. To receive liquidated damages under the ADEA, a plaintiff must prove that the violation was willful. 29 U.S.C. § 626(b). The district court found that there was

18

sufficient evidence to support the jury finding that Unocal's violations were willful. Specifically, the court found that the evidence that Unocal ignored the in-house adverse impact study conducted by Love, the evidence of age-based remarks by Van Deventer, and the secrecy surrounding Unocal's decision-making process were sufficient to permit the jury to infer willfulness. The district court found that, though this evidence of willfulness was sufficient, it was still sparse. Thus the court limited the liquidated damages amount to $2,500 per Appellee. On appeal, Unocal argues that there was insufficient evidence of willfulness and thus there should have been no liquidated damages award. The Appellees argue that, once the district court had found the evidence sufficient to support a willfulness finding, liquidated damages were mandatory in an amount equal to the back pay award.

9. FLSA Claims

Plaintiffs Price, Hough, Earles, and Powers asserted FLSA claims for unpaid overtime compensation. The district court severed these claims from the ADEA claims and held a bench trial on the FLSA claims. The court found that production foreman Price, HES coordinator Hough, and production technician Earles all fell within the administrative exemption to the FLSA. Under the administrative exemption, employees in "bona fide executive, administrative, or professional" positions are not statutorily

entitled to overtime pay. 29 U.S.C. § 213(a)(1). The district court found that plaintiff Powers, who worked as a production clerk, was non-exempt and thus entitled to an award of $7,700.32 for unpaid overtime. Unocal does not challenge the award to Powers, and Price does not challenge the determination that he was an exempt employee. However, Hough and Earles each challenge the ruling that they were exempt employees.

10. Attorneys' Fees and Expenses

In their motion for fees and expenses, the Plaintiffs requested $946,366.12 in attorneys' fees. They arrived at this figure as follows: $559,574.75 for 3,257.95 attorney hours billed at rates varying from $100 to $225 per hour plus $71,336.00 for 1,115.20 hours of legal assistant work billed at rates from $30 to $80 per hour yielded a sum of $630,910.75. The Plaintiffs urged that this sum be enhanced by fifty percent, pursuant to the twelve factors listed in *Johnson v. Georgia Hwy. Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), for a total lodestar amount of $946,366.12. Unocal argued that the *Johnson* enhancement was improper and that fifteen percent of the Plaintiffs' billing could be attributed to the unsuccessful claims.

The district court found that the twelve *Johnson* factors did not warrant enhancement of the lodestar figure. The court agreed with Unocal that a fifteen percent reduction was proper due to the limited nature of the Plaintiffs' success. The court

20

accepted the Plaintiffs' contention that the $630,910.75 figure already included about a ten percent reduction from the hours actually billed. Reducing it by a further five percent, the court set the lodestar fee figure at $590,000.

The court agreed with Unocal that the Plaintiffs could not recover $75,424.81 attributable to expert witness fees. Thus the court awarded the Plaintiffs $45,841.94 in trial costs, rather than the $121,266.75 the Plaintiffs had requested. The court also awarded the Plaintiffs their requested fees and costs for preparation of the motion and for anticipated appeal. The total fees and costs award was $694,141.94.

On appeal, Unocal argues that its successful appeal on the merits would render the Plaintiffs ineligible to recover any fees and, in the alternative, that the total fees and costs award set by the district court was appropriate. The Plaintiffs ask this court to grant a delay enhancement and appeal the district court's holding that expert witness fees are not recoverable.

**Discussion**

I. Standards of Review

*Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144 (5th Cir. 1995), describes the general standard of review for a JMOL when the defendant moved for JMOL both before and after the verdict:

> "[J]udgment as a matter of law is appropriate if the facts and inferences point so strongly and overwhelmingly in favor of one party that a reasonable jury could not have concluded that the ADEA was violated. A mere scintilla of evidence is

21

insufficient to present a question for the jury.  There must be a conflict in substantial evidence to create a jury question. . . . [T]he district court's judgment should be reversed only if the facts and accompanying inferences would not permit reasonable people to conclude that" the ADEA was violated.  *Id.* at 148 - 49 (internal citations omitted).

*See also Boeing Co. v. Shipman*, 411 F.2d 365, 374 - 75 (5th Cir. 1969) (*en banc*); Fed. R. Civ. P. 50(a).

"The district court's determination of attorney's fees is reviewed for abuse of discretion, and the findings of fact supporting the award are reviewed for clear error."  *Shipes v. Trinity Industries*, 987 F.2d 311, 319 (5th Cir. 1993).

Specific considerations related to the standard of review for particular questions arising in this appeal are noted below as appropriate.

II. Equitable Estoppel

Unocal challenges the district court's holding that equitable estoppel saved the Plaintiffs' ADEA claims from being time-barred.  We affirm the district court on this issue.

There is no dispute that the Plaintiffs failed to file their discrimination charges with the EEOC within 300 days from the date of the allegedly unlawful employment practice and that their ADEA claims would be time-barred unless equitable estoppel or equitable tolling operated to save them.[3]

---

[3]Because Texas is a "deferral" state, *see Conaway*, 955 F.2d at 363 & n.3, under the ADEA, the limitations period for filing an age discrimination charge with the EEOC is 300 days, 29 U.S.C. § 626(d).

"The EEOC filing requirement functions as a statute of limitations rather than a jurisdictional prerequisite. . . . The filing deadline is thus subject to equitable modification, i.e. tolling or estoppel, when necessary to effect the remedial purpose of ADEA." *Rhodes v. Guiberson Oil Tools*, 927 F.2d 876, 878 (5th Cir. 1991) (*Rhodes I*) (internal citations omitted). The doctrine of equitable estoppel "may properly be invoked when the employee's untimeliness in filing his charge results from either the employer's deliberate design to delay the filing *or* actions that the employer should unmistakably have understood would result in the employee's delay." *Clark v. Restistoflex Co.*, 854 F.2d 762, 769 (5th Cir. 1988) (internal quotation marks omitted) (emphasis added).

The equitable estoppel inquiry involves questions of fact and law. Questions such as whether the employer misled the employee are questions of fact and determinations by the trier of fact are reviewed for clear error. *See Rhodes I*, 927 F.2d at 880; *Clark*, 854 F.2d at 769. The applicability of equitable estoppel to the facts is a question of law that this court reviews *de novo*. *Rhodes I*, 927 F.2d at 881. Equitable estoppel "does not hinge on intentional misconduct on the defendant's part. Rather, the issue is whether the defendant's conduct, innocent or not, reasonably induced the plaintiff not to file suit within the limitations period." *McGregor v. Louisiana State*

23

*Univ. Bd. of Supervisors*, 3 F.3d 850, 865 - 66 (5th Cir. 1993).

The district court correctly concluded that the evidence was sufficient to support the jury's finding that Unocal's conduct induced Plaintiffs from timely filing their claims.[4] Ettensohn, an in-house attorney for Unocal and an employment law specialist, testified that he prepared the language used in the 1996 Release. He also testified to his belief that the releases signed by the Plaintiffs specifically referenced age discrimination claims. Ettersohn admitted that the releases were not actually effective to release the ADEA claims because they did not fully comply with the OWBPA's requirements. But the release language could easily suggest to a layman that all ADEA claims had been effectively waived. They state affirmatively that Unocal is discharged from "all claims, liabilities, demands and causes of action." With the exception of the release signed by Hough, all the release forms specifically referenced the ADEA as one type of claim being released. (The release signed by Hough expressly purported to release *all* claims, which would include ADEA claims.) The Plaintiffs testified that they did in fact believe that they had signed away all potential claims and rights under the ADEA. Plaintiff Tyler testified that he only began to think otherwise

---

[4]The jury instruction on this issue were as follows: "For each of the following plaintiffs, do you find that the defendant's conduct induced him to refrain from filing his claim with the EEOC within 300 days of the alleged unlawful practices?" The jury answered "yes" with regard to each plaintiff.

when he happened to mention the releases to an attorney in August or September 1997. As the district court found, the evidence supported a finding that Unocal should have "unmistakably have understood," that the releases would mislead the Plaintiffs in this way.[5]

III. Admission of the Plaintiffs' Statistical Evidence

We apply an abuse of discretion standard when reviewing a trial court's decision to admit or exclude expert testimony. *Kumho Tire Co. Ltd. v. Carmichael*, 119 S.Ct. 1167, 1176 (1999). The district court's ruling will be sustained unless manifestly erroneous. *Boyd v. State Farm Ins. Cos.*, 158 F.3d 326, 331 (5th Cir. 1998).

Unocal attacks the statistical evidence presented by Dr. Frank on five specific grounds: (1) the statistical groupings; (2) assumptions that terminations were involuntary; (3) unreliable data; (4) failure to control for factors other than age; (5) use of age as a continuous variable; and (6) Unocal's own statistical analysis does not indicate discrimination.[6]

---

[5]The jury charge did not ask for a specific finding as to what Unocal "unmistakably understood." But Unocal did not object to the form of the jury question on equitable estoppel. The district court was entitled to make the finding on this issue in light of the jury's finding that each plaintiff was induced from timely filing his claim. *See* Fed. R. Civ. P. 49(a).

[6]Unocal's objections to the statistical evidence were adequately preserved. Among other things, the district court granted a running objection to Dr. Frank's testimony.

Under the abuse of discretion standard, the district court did not commit manifest error in admitting Dr. Frank's testimony. As the district court noted, many of Unocal's arguments go to the weight of Dr. Frank's testimony rather than to its admissibility. Some of Unocal's arguments are simply without merit.

Unocal's argument that Dr. Frank's testimony should be excluded because his statistical groupings compared employees over fifty with those under fifty, rather than comparing those over forty with those under forty, is without merit.  Although the ADEA protects employees over the age of forty, this court and the Supreme Court have recognized that the relevant age groupings for a particular ADEA case will vary by the circumstances of the case.  *See O'Connor v. Consolidated Coin Caterers Corp.*, 116 S.Ct. 1307, 1310 (1996) (fact that one person in the ADEA protected class has lost out to another person in the protected class is not determinative as long as the person lost out *because* of his age); *Fields v. J.C. Penney Co., Inc.*, 968 F.2d 533, 536 & n.2 (5th Cir. 1992) (*per curiam*) (ADEA plaintiff may prove *prima facie* case by showing he was replaced by someone younger, even if replacement was within the protected class); *Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1506 (5th Cir. 1988) (same).  In the instant case, each of the Plaintiffs was over age fifty at his termination and each plaintiff who was replaced was replaced with an employee under age fifty.

26

Unocal's argument that Dr. Frank improperly counted as "terminated" all employees who received the redeployment package is without merit. There was sufficient evidence that almost no one who was placed in the redeployment pool was rehired and that placement in the pool was effectively equivalent to termination.

Under the evidence here, Unocal's objection that Dr. Frank created his own database, which was unreliable, goes to probative weight rather than to admissibility. Dr. Frank compiled his database from documents provided by Unocal during discovery. Unocal did not show that Dr. Frank's compilation of the data provided him was itself unreliable. *Cf. Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000) ("Both the determination of reliability itself and the factors taken into account are left to the discretion of the district court consistent with its gatekeeping function under Fed. R. Evid. 702."). Unocal instead attempts to show that the underlying data – provided *by Unocal* -- was itself unreliable. This is an issue that Unocal could – and did – raise in cross-examination.

Unocal asserts that Dr. Frank failed to control for factors other than age. But Dr. Frank did control for other relevant variables. Dr. Frank ran tests showing that the correlation between employee performance evaluations and retention was statistically insignificant. Dr. Frank also controlled for geographical location by confining his analysis to the Permian

27

Basin Asset Group.  Omission of variables may render an analysis less probative than it might otherwise be, but, absent some other infirmity, an analysis that accounts for the major factors will be admissible.  *Bazemore v. Friday*, 106 S.Ct. 3000, 3009 (1986) (Brennan, J., joined by all other members of the Court, concurring in part).

Unocal criticizes Dr. Frank's use of age as a continuous variable.  The tests run using age as a continuous variable were far from the only tests Dr. Frank performed on the data.  *Cf. Koger v. Reno*, 98 F.3d 631, 636 - 37 (D.C. Cir. 1996) (regression analysis that was the *sole* evidence presented in support of age discrimination and which used age as a continuous variable was not legally relevant).  Even if flawed, these tests do not render Dr. Frank's entire analysis irrelevant.  Further, Dr. Frank verified that the ages of Unocal's employees were normally distributed.

Finally, Unocal asserts that its own statistical analysis, performed by Dr. Baxter, does not support an inference of discrimination.  The district court, acting within its discretion, found that Dr. Baxter's opinion was not conclusive enough to discredit entirely Dr. Frank's methodologies.  *Cf. Daubert v. Merrell Dow Pharms.*, 113 S.Ct. 2786, 2795 (1993) (it is the trial judge's function to ensure that expert testimony is reliable).  Given that finding, Dr. Baxter's conflicting opinion

28

goes to the weight of Dr. Frank's testimony, not its admissibility.

The district court did not abuse its discretion by admitting Dr. Frank's statistical evidence.

IV. Price's ADEA Claim

We agree with the district court that Price did not produce sufficient evidence of an adverse employment action to support the jury's award of damages on his ADEA claim.

The district court held that Price "did not establish a prima facie case." Price relies on several cases, *e.g.*, *U.S. Postal Service Bd. of Govs. v. Aikens*, 103 S.Ct. 1478 (1983); *Russell v. McKinney Hospital Venture*, 235 F.3d 219 (5th Cir. 2001), to argue that the *prima facie* case is no longer relevant after a case has gone to the jury. These cases on which Price relies are distinguishable because they involved elements of the *prima facie* case that went to proving *discrimination*, not *injury*. *Aikens*, 103 S.Ct. at 1481 (ultimate question was discrimination *vel non*); *Russell*, 235 F.3d at 224 (issue was plaintiff's proof of discrimination). The *McDonnell Douglas* evidentiary framework is primarily concerned with the plaintiff's initial burden when attempting to prove discrimination by circumstantial evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 120 S.Ct. 2097, 2105 (2000). A plaintiff who proves discrimination must still prove injury to recover damages. *Armstrong v. Turner Indus.*, 141 F.3d

29

554, 560 (5th Cir. 1998) (to recover, a discrimination plaintiff will have to prove a cognizable injury, usually an adverse employment decision).

It is clear from the district court's discussion that the district court found that the employment actions Price established – his transfer and subsequent resignation – did not amount to adverse employment action.  Adverse employment action is part of the *prima facie* showing in an ADEA case because that is normally an element that the plaintiff will have to prove in order to receive a remedy under the ADEA.  *See* 29 U.S.C. § 623(a)(1) (under ADEA, it is unlawful for employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual" because of age); *Armstrong*, 141 F.3d at 560.  The money damages awarded to Price by the jury verdict were compensatory damages for the loss of his job with Unocal.  To support this verdict, Price had to prove that his termination was a cognizable injury caused by the age discrimination.  *See Armstrong*, 141 F.3d at 562 (when plaintiff did not identify any cognizable and compensable injury caused by the allegedly discriminatory act, he could not recover).

When, as here, a plaintiff resigned, he may satisfy the injury element by proving constructive discharge.  *See Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 319 (5th Cir. 1997).  Because Price was transferred to another position and then resigned, a

30

constructive discharge analysis is appropriate for determining whether Price suffered an adverse employment action.  Price did not request a constructive discharge jury instruction and Price did not produce evidence sufficient to support an implied finding of constructive discharge.

"To prove constructive discharge, a plaintiff must establish that working conditions were so intolerable that a reasonable employee would feel compelled to resign."  *Id.*

> "Stated more simply, [the plaintiff's] resignation must have been reasonable under all the circumstances. Whether a reasonable employee would feel compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement on terms that would make the employee worse off whether the offer was accepted or not." *Barrows v. New Orleans S.S. Ass'n.*, 10 F.3d 292, 297 (5th Cir. 1994).

Price did not produce evidence that his transfer from production foreman to HES coordinator created conditions so intolerable that a reasonable employee would feel compelled to resign.  Price testified that the HES job was to be at the same salary.[7]  Although Price asserts that the HES job was a demotion,

_____

[7] On appeal, Price asserts that he would have lost salary. However, Price testified that he understood "[t]he salary was to be the same." He went on to state, "I also felt like that I probably wouldn't get any more raises."  Price offered no testimonial or other evidence to prove that his salary was lower or that his

31

there was no evidence presented sufficient for a jury to reach this conclusion. *Cf. Sharp v. City of Houston*, 164 F.3d 923, 933 (5th Cir. 1999) (transfer may be a demotion if the new position proves *objectively* worse). The HES job was not menial or degrading. Hough, Price's co-plaintiff and a former HES coordinator, provided testimony suggesting that the responsibilities of an HES coordinator, though different in kind from those of a production foreman, were at least comparable in degree. Hough testified that he worked as a production foreman from 1979 to 1990. He then moved over to work in HES. Hough testified, "[B]eing an HES is quite different than being a production foreman. Grant you, a production foreman has to know a lot of things as far as regulations of environmental laws and safety regulations, but being responsible for all the individuals in the area where you work, it's a whole lot different." There is no evidence that Price's new position was objectively worse than his old one.

Although Price testified that Van Deventer made age-based comments to him at various times, there was no evidence of anything approaching "badgering" during the HES job. Price was not specific regarding the dates of Van Deventer's comments, so it cannot be simply assumed that they occurred during the HES

_____

concern about a lack of future raises was anything but speculative.

job, which Price only held for a few days.  The only evidence Price presented that the HES job was intolerable was his testimony as to his subjective belief that he was set up to fail in this job which would require him to get new training.  That does not meet the objective "reasonable employee" standard articulated in *Barrows*.  *See Guthrie v. J.C. Penney Co., Inc.*, 803 F.2d 202, 207 (5th Cir. 1986).

We affirm the district court's holding that the evidence did not support an award of damages to Price.

V.  The Appellees' ADEA Claims

With regard to plaintiffs Hough, Earles, and Burkett, Unocal's argument asserts particularized non-discriminatory reasons for their terminations: Unocal asserts that Hough and Earles were offered new jobs and voluntarily chose to take the severance package instead and that Burkett was placed in the redeployment pool because of a good faith mistake.  Unocal argues that there was insufficient evidence to prove that these three plaintiffs were discriminated against based on age.  Unocal's arguments regarding Hough and Earles also raise issues as to whether they actually suffered adverse employment actions.

A. Sufficiency of Discrimination Evidence

When the defendant employer comes forward with evidence of a legitimate, non-discriminatory reason for an adverse employment action, the presumption of discrimination raised by the

plaintiff's *prima facie* case drops out and the plaintiff may attempt to prove discrimination by offering evidence that the employer's stated reason is pretextual. *Reeves*, 120 S.Ct. at 2106. The burden of persuasion at all times remains on the plaintiff. *Id.* In a disparate treatment case, such as the case at bar, a plaintiff must produce sufficient evidence to rebut a showing by the employer that there was a legitimate, non-discriminatory reason for discharging a particular employee. *See Bauer v. Albemarle Corp.*, 169 F.3d 962, 968 (5th Cir. 1999). In the instant case, Hough, Earles and Burkett produced sufficient evidence for a reasonable jury to conclude that Unocal's asserted reasons were pretextual and that the real reason was intentional, age-based discrimination. *See Reeves*, 120 S.Ct. at 2109 ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

In November 1996, Ponville, Unocal's new Onshore Operations Manager, chaired a several-hour long meeting with field superintendents Van Deventer, Van Horn, and Leyendecker at which decisions affecting the Plaintiffs were made. All four of the meeting participants were in their thirties. Although Ponville testified that he did not really know any of the Plaintiffs

34

except Tyler,[8] he asserted generally that employment decisions about who would fill the positions in the reorganized business unit were based on employee performance.

Van Horn testified that he did not recall any discussion regarding any of the Plaintiffs at the November meeting. In her testimony, Van Deventer acknowledged that she participated in the meeting but was not asked to go into detail with regard to discussions at the meeting. Ponville admitted that he did not retain any documentation reflecting reasons for employment decisions resulting from the meeting.

With the exception of Tyler, Ponville did not state any specific performance-based reasons why any of the individual Plaintiffs were *not* assigned positions in the reorganized unit. With regard to Tyler, Ponville provided some specific comparisons between Tyler's performance as a field superintendent and that of Van Horn, Van Deventer, and Leyendecker.[9] Ponville admitted that

_____

[8]Ponville testified that he had seen Burkett in the office and that he may have participated in a meeting with Hough.

[9]In its reply brief, Unocal argues for the first time that there was insufficient evidence of age discrimination against Tyler. Unocal Red Brief at 46. In its initial brief to this court, Unocal's only assignments of error with respect to the judgment in favor of Tyler were the claims that the entire suit was time-barred and that, in the alternative, there was insufficient evidence to support the willfulness finding. Only for Hough, Earles, and Burkett did Unocal initially assert that there was conclusive evidence of legitimate, non-discriminatory reasons for the adverse employment actions. Unocal's argument that Tyler did not prove age discrimination came too late. "This Court will not consider a claim raised for the first time in a reply brief." *Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir. 1993).

35

Tyler was ranked ahead of Van Horn in the forced ranking and that Ponville had never reviewed Tyler's performance appraisals in detail or spoken with Tyler's supervisors about Tyler. Following the meeting, four former field superintendent positions were consolidated into three positions, which were filled by Van Horn, Van Deventer, and Leyendecker. Van Horn took over the field that had previously been under Tyler.

As evidence of Unocal's policies, the Plaintiffs proffered Unocal's Human Resources Policies and Procedures manual. The manual included, *inter alia*, a statement that "planning [for a RIF] should include . . . Documentation of non-discriminatory reasons for adverse personnel decisions." Ponville testified that he was aware that Unocal policy called for keeping such documentation. Ponville admitted that, the policy notwithstanding, he failed to keep documentation of non-discriminatory reasons for adverse decisions. Ponville shredded whatever documentation he had. Ponville further conceded that the human resources department would have no way of knowing the reasons for the adverse personnel decisions.

An employer's conscious, unexplained departure from its usual polices and procedures when conducting a RIF may in appropriate circumstances support an inference of age discrimination if the plaintiff establishes some nexus between

36

employment actions and the plaintiff's age. *See EEOC v. Texas Instruments*, 100 F.3d 1173, 1182 (5th Cir. 1996); *Moore v. Eli Lilly Co.*, 990 F.2d 812, 819 (5th Cir.), *cert. denied*, 114 S.Ct. 467 (1993). Here, such a nexus was established. Ponville testified that he based his decisions on performance, yet he testified that he was *not* familiar with Hough, Earles and Burkett and their job performance. Hough, Earles and Burkett introduced evidence that they had received positive performance appraisals in recent years. *Cf. Risher v. Aldridge*, 889 F.2d 592, 598 - 98 (5th Cir. 1989) (plaintiff failed to allege a nexus with failure to consider written performance appraisals when employer explained why the written appraisals were unreliable and that decision-maker was personally familiar with plaintiff's performance). Ponville knew that he was supposed to keep documentation of the reasons for adverse employment decisions, yet he did not do so.

Hough, Earles and Burkett's evidence of satisfactory performance, Ponville's failure to keep documentation and his admission that he was not familiar with Hough, Earles and Burkett and their job performance, were sufficient to permit an inference that the performance rationale was a pretext for intentional discrimination in the conduct of the RIF. But, Hough, Earles, and Burkett still had to rebut Unocal's evidence of particularized, non-discriminatory reasons for their discharges.

37

B. Hough and Earles

With regard to Hough and Earles, Unocal's position is that each of these plaintiffs chose the termination package after they were approached by Van Horn about whether they were interested in reassignment and expressed to Van Horn that they were not interested. The testimony concerning the conversations with Van Horn conflicted. Both Hough and Earles testified that, in their respective conversations with Van Horn, Van Horn was vague as to what the new positions would entail and what they would pay. According to these plaintiffs' testimony, the only thing Van Horn was certain about was that the new jobs would likely pay less than their old jobs. Hough did indicate that Van Horn definitely said that he would have a job. Earles testified that Van Horn told him that there was only a possibility that he would have a job. Van Horn demanded to know whether Earles was interested before he hung up the telephone. Hough testified that Van Horn demanded an answer within a few hours, even though Van Horn could not tell Hough what or where the job would be.

The jury could reasonably have chosen to believe the plaintiffs' version of the Van Horn conversations and could infer that any "job offers" were so indefinite that they were not bona fide and did not present Hough or Earles with a real choice between accepting termination or continued employment. Unocal does not dispute that, at least, new jobs for these plaintiffs

38

would have involved salary compression.  An act affecting compensation is itself a type of adverse employment action that is actionable in a discrimination case.  *See Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir. 1997).  The testimony that Van Horn pressured these plaintiffs to make quick decisions about these questionable uncertain job "offers" was bolstered by Earles's testimony that Van Deventer had admitted that Unocal had such a practice of pressuring older employees into early retirement.  *Cf. Guthrie v. J.C. Penney Co.*, 803 F.3d 202, 208 (5th Cir. 1986) (jury could infer that repeated inquiries about plaintiff's retirement plans were intentional harassment).

The jury could rationally infer that Hough and Earles suffered adverse employment actions because evidence was presented that these plaintiffs were not extended bona fide offers but were offered only a "choice" between uncertain continued employment, in unspecified jobs at unspecified but lower pay, and accepting termination benefits.  We affirm the district court's holding in favor of Hough and Earles on their ADEA claims.

C. Burkett

With regard to Burkett, Unocal asserts that it gave him the redeployment package because of a good faith mistaken belief that he desired the redeployment package rather than reassignment to another job.  Burkett testified that, after a meeting about the

RIF and before his redeployment, he told Van Deventer that he would accept any job. He further testified that right after he got his redeployment package, he met with Dupriest and said that he would take any available job. The jury was entitled to believe Burkett's testimony and to infer that Unocal's decision-makers were on notice that Burkett wanted to keep working. We affirm the district court's judgment in favor of Burkett on his ADEA claim.

VI. Liquidated Damages

The district court awarded $2,500 in liquidated damages to each of the Appellees. Unocal argues that the evidence was insufficient to support the finding of willful discrimination that is necessary for a liquidated damages award under the ADEA. The Appellees argue that, once there is a finding of willfulness, the ADEA mandates liquidated damages in an amount that doubles the back pay award.

A. Willfulness

Under the ADEA, liquidated damages are only payable for "willful" violations. 29 U.S.C. § 626(b). A violation is willful "if the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." *Hazen Paper Co. v. Biggins*, 113 S.Ct. 1701, 1708 (1993) (quoting *Trans World Airlines, Inc. v. Thurston*, 105 S.Ct. 613, 624 (1985)). An employer who knowingly relies on age in reaching a

40

decision does not invariably commit a knowing and reckless ADEA violation. *Id.* "If an employer incorrectly but in good faith and nonrecklessly believes that the statute permits a particular age-based decision, then liquidated damages should not be imposed." *Id.* at 1709.[10] The district court found that there was sufficient evidence to support the jury's finding of willfulness. We affirm this holding.

A finding of willfulness does not require a showing that the employer's conduct was "outrageous." *Id.* at 1710. We have upheld jury findings of willfulness when a jury's finding of intentional violation of the ADEA necessarily implied a finding that the employer's proffered explanation for the adverse employment action was pretextual. *See Burns v. Tex. City Refining, Inc.*, 890 F.2d 747, 751 - 52 (5th Cir. 1989); *Powell v. Rockwell Int'l Corp.*, 788 F.2d 279, 288 (5th Cir. 1986); *but see Russell*, 235 F.3d at 230 (plaintiff's evidence of ADEA violation was not sufficient to support willfulness finding) (we conclude that the willfulness evidence here is materially stronger than that in *Russell*). Ettensohn's testimony and the policy manual make it clear that Unocal was aware that the ADEA applied to the implementation of the RIF and Unocal does not claim that it

---

[10]For example, the employer may in good faith but mistakenly believe that an exemption permitting an age-based decision applied. *See Hazen Paper*, 113 S.Ct. at 1708.

41

believed any exemption applied permitting it to make age-based decisions as to the Appellees. Unocal's proffered explanation for the employment decisions made during the RIF was that the decisions were premised on a forced ranking based on performance. Yet Ponville, the primary decision-maker, testified that he was not personally familiar with the performance of Earles, Hough or Burkett. The Appellees presented evidence of their satisfactory performance records. Ponville destroyed all documentation relating to the adverse employment decisions, although Unocal policy called for retention of a record of non-discriminatory reasons for such decisions. This and the other evidence discussed above suffices to support the jury's finding that Unocal knew or showed reckless disregard for whether its conduct violated the ADEA.

B. Amount of Liquidated Damages

We must now consider whether the finding of willfulness necessitated a mandatory liquidated damages award equal to the amount of the back pay award. We hold that it does.

The ADEA statute provides for liquidated damages by means of cross-reference to the FLSA. *See* 29 U.S.C. § 626 (b) (providing that ADEA remedies shall be enforced in accordance with, *inter alia*, 29 U.S.C. § 216 and that back pay under ADEA is treated as unpaid minimum wages and overtime compensation for purposes of applying FLSA provisions); 29 U.S.C. § 216(b) (employers who

42

violate minimum wage and overtime compensation provisions of FLSA

shall be liable for the back pay "and in an additional equal

amount as liquidated damages").[11]

---

[11] 29 U.S.C. § 626(b) provides in full:
"(b) Enforcement; prohibition of age discrimination under fair labor standards; unpaid minimum wages and unpaid overtime compensation; liquidated damages; judicial relief; conciliation, conference, and persuasion.

The provisions of this title shall be enforced in accordance with the powers, remedies, and procedures provided in sections 211(b), 216 (except for subsection (a) thereof), and 217 of this title, and subsection (c) of this section. Any act prohibited under section 623 of this title shall be deemed to be a prohibited act under section 215 of title. Amounts owing to a person as a result of a violation of this chapter shall be deemed to be unpaid minimum wages or unpaid overtime compensation for purposes of sections 216 and 217 of this title: Provided, That liquidated damages shall be payable only in cases of willful violations of this chapter. In any action brought to enforce this chapter the court shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter, including without limitation judgments compelling employment, reinstatement or promotion, or enforcing the liability for amounts deemed to be unpaid minimum wages or unpaid overtime compensation under this section. Before instituting any action under this section, the Equal Employment Opportunity Commission shall attempt to eliminate the discriminatory practice or practices alleged, and to effect voluntary compliance with the requirements of this chapter through informal methods of conciliation, conference, and persuasion."

29 U.S.C. 216(b) provides:
"Damages; right of action; attorney's fees and costs; termination of right of action

Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Any employer who

This circuit has never ruled on the precise question posed by this case – whether the ADEA mandates an award of liquidated damages in an amount equal to the back pay award upon a finding of willfulness.[12]  In *Thurston*, the Supreme Court assumed that

violates the provisions of section 215(a)(3) of this title shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) of this title, including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages. An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought. The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action. The right provided by this subsection to bring an action by or on behalf of any employee, and the right of any employee to become a party plaintiff to any such action, shall terminate upon the filing of a complaint by the Secretary of Labor in an action under section 217 of this title in which (1) restraint is sought of any further delay in the payment of unpaid minimum wages, or the amount of unpaid overtime compensation, as the case may be, owing to such employee under section 206 or section 207 of this title by an employer liable therefor under the provisions of this subsection or (2) legal or equitable relief is sought as a result of alleged violations of section 215(a)(3). "


[12]In at least two post-*Thurston* cases, we have commented on the issue in dicta. *See Smith v. Berry Co.*, 165 F.3d 390, 395 (5th Cir. 1999) ("[L]iquidated damages *may not exceed* the back pay award. That is, a finding of willfulness *can* double the damages awarded to

44

the double recovery was required after any finding of willfulness.  *See Thurston*, 105 S.Ct. at 625 (observing that too broad a standard for willfulness "would result in an award of double damages in almost every case").  In at least one post-*Thurston* decision, this court has assumed the same thing.  *Burns v. Texas City Refining*, 890 F.2d 747, 752 (5th Cir. 1989) ("Pursuant to 29 U.S.C. § 626(b), a finding of willfulness *entitles* the plaintiff to a doubling of any back pay award." (emphasis added)). A majority of our sister circuits have expressly held or have assumed that double damages were mandatory after a finding of willfulness:   Four circuits have expressly held that this is the case.  *Mathis v. Phillips Chevrolet, Inc.*, 269 F.3d 771, 777 (7th Cir. 2001); *Greene v. Safeway Stores, Inc.*, 210 F.3d 1237, 1246 (10th Cir. 2000); *Spencer v. Stuart Hall Co., Inc.*, 173 F.3d 1124, 1129 (8th Cir. 1999); *Hill v.*

---

a successful ADEA plaintiff." (emphasis added)); *Purcell v. Seguin State Bank & Trust Co.*, 999 F.2d 950, 956 (5th Cir. 1993) ("[E]ven when the plaintiff has proved willfulness, the court has discretion about whether to award liquidated damages.").  The precise issue we decide today was not necessary to the decision of either case.  In *Smith*, the district court had awarded double damages and the appellate court affirmed the willfulness finding and the damage award.  *Id.* at 395. In *Purcell*, there was no evidence supporting the willfulness finding, so no liquidated damages were awarded. *Id.* at 958.  The dicta in *Purcell* can be further distinguished because it relied for support on the pre-*Thurston* case of *Elliot v. Group Medical & Surgical Service*, 74 F2d 556, 558 (5th Cir. 1983), which in turn relied on *Hays v. Republic Steel Corp.*, 531 F.2d 1307 (5th Cir. 1976). *Hays* was expressly disapproved in *Thurston*.  *Thurston*, 105 S.Ct. at 625 n.22.

*Spiegel, Inc.*, 708 F.2d 233, 238 (6th Cir. 1983). Three circuits have at least assumed that it was so. *See McGinty v. State*, 193 F.3d 64, 71 & n.6 (2d Cir. 1999); *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1099 (3d Cir. 1995) ("ADEA provides double damages when the employer's discriminatory conduct is willful"); *Biggins v. Hazen Paper Co.*, 953 F.2d 1405, 1416 (1st Cir. 1992), *vacated on other grounds*, 113 S.Ct. 1701 (1993).[13]

We hold that the plain language of the statutes requires the interpretation that liquidated damages in an amount equal to the back pay award are mandatory upon a finding of willfulness.[14] Accordingly, we remand this portion of the case to the district

---

[13]A case from the Eleventh Circuit seems to have assumed that a willfulness finding "entitles" the plaintiff to liquidated damages, but did not address whether double recovery was a mandatory amount. *Day v. Liberty Nat. Life Ins. Co.*, 122 F.3d 1012, 1016 (11th Cir. 1997). Cases from the Fourth and Ninth Circuits seem to have assumed that liquidated damages were permitted, but perhaps not mandatory, after a finding of willfulness. *Herold v. Hajoca Corp.*, 864 F.2d 317, 323 (4th Cir. 1998) (plaintiff "may recover" liquidated damages); *AARP v. Farmers Group, Inc.*, 943 F.2d 996, 1006 (9th Cir. 1991) (statute "authorizes" liquidated damages).

[14]This conclusion is further bolstered by 29 U.S.C. § 260, which provides an employer with a "good faith" defense under the FLSA. In an FLSA case, the liquidated damages provided for in 29 U.S.C. § 216(b) are mandatory unless the employer satisfies the requirements for the good faith defense, in which case 29 U.S.C. § 260 expressly provides the district court with discretion to award no liquidated damages or to award such damages in an amount not to exceed the amount provided for in § 216(b). 29 U.S.C. § 216(b); *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1414 - 15 & n.8 (5th Cir. 1990). But "the ADEA does not incorporate [29 U.S.C. § 260]." *Thurston*, 105 S.Ct. at 625 n.22. Thus, there is no provision in the ADEA for discretion in the award of liquidated damages once a willfulness finding has been made.

46

court with instructions to enter judgment awarding liquidated damages in an amount equal to the back pay award for each of the Appellees.

VII. Compensatory Damages – Back Pay and Front Pay

In reviewing a district court's damage award, this court reviews all issues of law *de novo*. *Rhodes v. Guiberson Oil Tools Div'n*, 82 F.3d 615, 620 (5th Cir. 1996) (*Rhodes II*). "Absent an error of law, a district court's award of compensatory damages presents an issue of fact, subject to the clearly erroneous standard of review." *Id.* If the district court's factual findings are plausible in light of the evidence presented, this court will not reverse its decision even if this court would have reached a different conclusion. *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 936 (5th Cir. 1996).

The Appellees, on their cross-appeal, challenge the district court's limitation of the back pay award to compensation through May 25, 2000 – the date Unocal/Spirit's Permian Basin operation ceased to exist – rather than through September 29, 2000 – the date of the final judgment. The Appellees also appeal the district court's denial of a front pay award.

A. Backpay

The purpose of ADEA back pay compensation is to restore the plaintiff to the position he would have been in absent the discrimination. *McKennon v. Nashville Banner Public Co.*, 115

47

S.Ct. 879, 886 (1995). The purpose is not to restore a plaintiff to a better position than he would have been in. *Cf. id.* (compensatory principle is difficult to apply when there is after-acquired evidence of plaintiff's wrongdoing that would have led the employer to terminate plaintiff anyway for a legitimate reason). As a matter of law, the district court did not err in finding that it could award back pay for some period less than the entire time up to the date of the judgment. *Cf. Brunneman v. Terra Intern. Inc.*, 975 F.2d 175, n.5 (5th Cir. 1992) (affirming jury award of back pay up to date of judgment, but not suggesting such an award was mandatory).

The determination of the proper period for awarding back pay is a factual matter that should be set aside only if clearly erroneous. *Id.* In the instant case, the district court's conclusion that back pay should only be awarded through the May 25, 2000 cessation of Unocal/Spirit's operation was not clearly erroneous. *Cf. McKennon*, 115 S.Ct. at 361 (in awarding back pay, district court can take account of "factual permutations" in the particular case). The factual finding that the business entity that employed the Appellees ceased to exist on May 25 is undisputed. Even absent discrimination, the Appellees would no longer be employed by Unocal and would not have received wages. The Appellees argue, however, that Pure was the alter ego of Unocal. They emphasize that Unocal was the majority shareholder

48

in Pure and controlled Pure's board of directors and that about seventy percent of Spirit employees moved to Pure. But the district court heard the evidence concerning the sale of Unocal's operations to Pure and impliedly found that Pure was not Unocal's alter ego or agent. The Appellees' assertions do not, without more, demonstrate that the district court's finding was clearly erroneous.

We decline to disturb the district court's award of back pay.

B. Front pay

Front pay is an equitable remedy that is normally employed when the ADEA's preferred remedy of reinstatement is impracticable. *Patterson*, 90 F.3d at 937 n.8; *Brunnemann*, 975 F.2d at 180. A front pay award is intended to compensate the plaintiff for wages and benefits he would have received from the defendant employer in the future if not for the discrimination. *Burns*, 890 F.2d at 753. This court reviews a district court's determination regarding a front pay award for abuse of discretion. *Id.*

In the instant case, if, as we hold above, the district court's back pay finding was not clearly erroneous, then the district court did not abuse its discretion by holding that the Appellees were not entitled to front pay. The back pay finding was effectively a finding that the Appellees would not have

49

received future wages from Unocal, even absent the discrimination. *See id.* at 753 (front pay award would be "purely speculative" when defendant employer sold assets to another company and many employees were terminated).

We affirm the district court's holding that the Appellees were not entitled to an award of front pay.

VIII. Whether Hough and Earles Were Exempt Under the FLSA

Hough and Earles appeal the district court's bench trial holding that they were "exempt" administrative employees under the FLSA and therefore not entitled to compensation for unpaid overtime.

The FLSA imposes maximum work hour standards and requires employers to compensate employees who work overtime. 29 U.S.C. § 207. Employees who are classified as "exempt" are not entitled to such compensation; in pertinent part, 29 U.S.C. § 213(a)(1) exempts "any employee employed in a bona fide executive, administrative, or professional capacity." These exemptions are construed narrowly against the employer and the employer has the burden of proving that an employee is exempt. *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1224 (5th Cir. 1990) The district court's findings as to whether an employee is exempt are reviewed under a mixed standard of review. In *Dalheim*, this court recognized that it can be difficult to discern which issues in this inquiry are questions of law and which are questions of fact. *Id.* at 1225.

The *Dalheim* court explained that questions of "historical fact" (e.g., whether an employee's work was reviewed by a supervisor) and inferences drawn from historical facts (e.g., whether an employees work is "original and creative") are fact findings reviewed for clear error. *Id.* at 1226. The ultimate finding whether the employee is exempt, though based on historical fact and factual inferences, is a legal conclusion subject to plenary *de novo* review. *Id.* Thus, the proper inquiry in the instant case is (1) whether the district court's historical factual findings and factual inferences were clearly erroneous and, (2) whether they support the district court's legal conclusion that Hough and Earles were exempt under the administrative exemption.

The Secretary of Labor has defined the test for the administrative exemption for employees who, like Hough and Earles, earned more than $250 per week, in 29 C.F.R. 541.2: An administratively exempt employee is one whose "primary duty" consists of "office or nonmanual work directly related to management policies or general business operations" and who "customarily and regularly exercises discretion and independent judgment."[15] The district court made findings of historical

---

[15]The employee must also meet the following criteria: "(c)(1) Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity (as such terms are defined in the regulations of this subpart), or

(2) Who performs under only general supervision work along

51

fact concerning Hough and Earles's employment and reached the legal conclusion that they met the test for the administrative exemption.

Hough and Earles assert that they do not seek to set aside the district court's factual findings and they do not argue that the specific findings listed by the district court are erroneous. They do, however, assert that the record contains additional evidence supporting further findings of fact. This amounts to requesting *de novo* review of the facts and is inappropriate for this court's review of the district court's factual findings made after a bench trial. *See Owsley v. San Antonio Indep. Sch. Dist.*, 187 F.3d 521, 523 n.1 (distinguishing *Dalheim*, in which the court reviewed factual findings following a bench trial only for clear error, from *Owsley*, in which the court was reviewing a summary judgment *de novo*). The district court considered the evidence cited by Hough and Earles in reaching its understanding of the pertinent facts and implicitly rejected the further

_____

specialized or technical lines requiring special training, experience, or knowledge, or

(3) Who executes under only general supervision special assignments and tasks; and

(d) Who does not devote more than 20 percent, or, in the case of an employee of a retail or service establishment who does not devote as much as 40 percent, of his hours worked in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (c) of this section." 29 C.F.R. 541.2.

findings that they now urge. Because Hough and Earles have not shown that the court's factual findings are clearly erroneous, and because they have not shown that the district court clearly erred in refusing to make the additional factual findings that they now assert, we take the district court's factual findings as established and review its conclusions of law *de novo*.

In *Lott v. Howard Wilson Chrysler-Plymouth*, 203 F.3d 326 (5th Cir. 2000), this court offered guidance for applying the administrative exemption:

> "The exercise of discretion and independent judgment necessitates consideration and evaluation of alternative courses of conduct and taking action or making a decision after the various possibilities have been considered. 29 C.F.R. § 541.207(a). This exercise of discretion and independent judgment must relate to matters of consequence. 29 C.F.R. § 541.207(b)-(c)(1). Final decision making authority over matters of consequence is unnecessary.

> As a general rule, an employee's 'primary duty' involves over 50% of the employee's work time. And yet, flexibility is appropriate when applying this rule, depending on the importance of the managerial duties as compared with other duties, frequency of exercise of discretionary power, freedom from supervision, and comparative wages." *Id.* at 331 (case citations omitted).

Further guidance is found in 29 C.F.R. § 541.201, in which the Secretary offers examples of staff employees who may typically qualify for the administrative exemption, provided they meet all the tests required in 29 C.F.R § 541.2. The district court's factual findings concerning Hough's position as HES Coordinator accord with the "safety director" position contemplated in 29

53

C.F.R. § 541.201(a)(2)(ii). Earles's production technician position is analogous to the "field representatives of utility companies" and "district gaugers for oil companies" contemplated in 29 C.F.R. § 541.201(a)(3). The district court did not err in its legal conclusion that Hough and Earles were exempt employees.

We affirm the district court's holding that Hough and Earles were not entitled to compensation for unpaid overtime on their FLSA claims.

IX. Whether Plaintiffs Were "Prevailing Parties" Entitled to Legal Fees

The ADEA, by reference to the FLSA, mandates that a district court award attorneys' fees to a plaintiff who is a "prevailing party." *Purcell*, 999 F.2d at 961. The court has discretion in deciding what is reasonable. *Id.* In the context of a 42 U.S.C. § 1988 action in which a plaintiff was awarded only nominal damages, the Supreme Court explained that "to qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim." *Farrar v. Hobby*, 113 S.Ct. 566, 573 (1992).

As detailed above, we affirm the district court's judgment in favor of the Appellees as to several of their claims. These plaintiffs have obtained "at least some relief on the merits" and thus qualify as prevailing parties. We have held that liquidated damages must be awarded in an amount equal to the back pay award.

54

In light of this holding, we instruct the district court to consider on remand what, if any, adjustment should be made to the amount of the legal fees award.

X.   Expert Witness Fees

The Appellees seek to add their expert witness fees to the fees and costs award.  The Supreme Court has explained that the interrelation of Fed. R. Civ. P. 54(d)(1) (relating to costs other than attorneys' fees), 28 U.S.C. § 1920 (listing "costs" that may be taxed by a federal court), and 28 U.S.C. § 1821 (authorizing per diem and travel expenses for witnesses) means that expert witness fees in excess of the standard witness per diem and travel allowances cannot be taxed in the absence of express statutory authority to the contrary.  *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 107 S.Ct. 2494, 2496 (1987);[16] *see also Leroy v. Houston*, 831 F.2d 576, 584 (5th Cir. 1987) (applying *Crawford* to fee-shifting provision of the Voting Rights Act).  There is no express statutory authority in the ADEA or the

---

[16]The wording of Rule 54(d)(1) has been slightly amended since *Crawford*.  *Compare* Fed. R. Civ. P. 54(d)(1) (2001) *with Crawford*, 107 S.Ct. at 2497.  But the operative language remains substantially the same in pertinent part.  In relevant part, current Rule 54(d)(1) reads: "Except when express provision therefor is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs."  The *Crawford* Court explained that § 1920 defines "costs" as used in Rule 54(d)(1) and enumerates the expenses that a federal court may tax as costs.  *Crawford*, 107 S.Ct. at 2497.  Section 1920 permits compensation for expert witnesses only when those witnesses are appointed by the court.  28 U.S.C. 1920(6).

FLSA to award expert witness fees for other than court-appointed expert witnesses. The district court did not err in refusing to award the Plaintiffs expert witness fees.

XI. Delay Enhancement

Following the district court's judgment on the fees and costs request, the Appellees moved for a delay enhancement in a motion to alter or amend the judgment filed pursuant to Fed. R. Civ. P. 59(e). The district court denied the motion. On appeal, the Appellees argue that the delay enhancement should be granted to compensate for the approximately two year (that is, up to the present time) delay in payment.

Denial of a Rule 59(e) motion to amend or alter a judgment is generally reviewed for abuse of discretion. *Fletcher v. Apfel*, 210 F.3d 510, 512 (5th Cir. 2000). Issues that are purely questions of law are, however, reviewed *de novo. See id.*

In the instant case, the Appellees did not request the delay enhancement in their original motion for attorneys' fees, although they did request a lodestar enhancement, which was denied. Their Rule 59(e) motion was not a motion to reconsider the judgment on its merits, rather it was a motion to consider a new issue. The Appellees do not argue that the district court erred in a question of law. The district court's application of the law to the facts is therefore subject to an abuse of discretion standard of review. The Appellees have not addressed

56

the standard of review for this issue and have not shown that the district court abused its discretion. The Appellees' concession that the district court's calculation of the lodestar amount was not an abuse of discretion weighs against finding in their favor on the delay enhancement issue. *See Walker*, 99 F.3d at 773 (district court may either grant unenhanced lodestar based on current rates or calculate lodestar using rates applicable when work was done and grant delay enhancement, but not both). The district court already awarded the Appellees $50,000 in attorneys' fees and $2,500 in costs for this appeal. We affirm the district court's denial of a delay enhancement.

## Conclusion

With regard to the appeals on the merits, we affirm the district court in all respects except as to the amount of liquidated damages. As we have explained, the ADEA mandates a liquidated damages award in an amount equal to the back pay award. We vacate and remand the damages award with instructions to award liquidated damages to each of the Appellees in an amount equal to his back pay award.

With regard to the fees and costs appeals, we affirm the district court in all respects except that we instruct the district court to consider, on remand, whether (and, if so, to what extent) an adjustment to the fees award is appropriate in light of the adjustment to the liquidated damages award.

57

AFFIRMED in part; VACATED in part; and REMANDED with instructions.