947 So.2d 317 (2006)
CASH DISTRIBUTING COMPANY, INC., Appellant Cross-Appellee
v.
James NEELY, Appellee Cross-Appellant.
No. 2004-CA-01124-COA.
Court of Appeals of Mississippi.
January 3, 2006.
Rehearing Denied May 2, 2006.
*320 Katherine S. Kerby, Columbus, attorney for appellant.
Rodney A. Ray, J. Douglas Ford, for attorneys for appellee.
EN BANC.
IRVING, J., for the Court.
¶ 1. James Neely sued Cash Distributing Company (Cash)[1] on a federal age discrimination claim under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634, (ADEA), and was awarded $120,000 by a jury. Cash appeals, and Neely cross-appeals the decision. *321 Cash argues that (1) it is entitled to a judgment notwithstanding the verdict because Neely failed to negate its age-neutral reasons for terminating his employment, and (2) the $120,000 award should be offset by $208,896.66. Neely contends that the trial court erred in (1) not granting a new trial on damages or granting an additur to the amount awarded by the jury, (2) failing to make an award of front pay, (3) failing to award prejudgment interest, (4) failing to award attorney's fees and costs, and (5) failing to award post-judgment interest on the jury verdict.
¶ 2. Finding error, we affirm in part, grant an additur, and reverse and remand in part.

FACTS
¶ 3. At the time of his termination, Neely worked for Cash as the general sales manager of Cash's Columbus, Mississippi office. At that time, Neely had worked for Cash for more than twenty-five years and was sixty years old. After he was fired, Neely sued Cash, alleging three state law claims and one federal claim. All the state claims were dismissed prior to trial by Neely, who continued on the basis of the ADEA claim. The jury found in favor of Neely, and awarded him $120,000 in back pay. The jury also specifically found that Cash's actions were not willful.[2] Both Neely and Cash appeal. Additional facts will be stated during the discussion of the issues.

ANALYSIS AND DISCUSSION OF THE ISSUES
A. Issues on Direct Appeal
1. Age-neutral reasons for termination
¶ 4. When reviewing the denial of a motion for judgment notwithstanding the verdict, we consider the evidence in a light most favorable to the non-moving party (in this case, Neely). We also give the non-moving party the "benefit of all favorable inference [sic] that may be reasonably drawn from the evidence." 3M Co. v. Johnson, 895 So.2d 151, 160 (¶ 30) (Miss. 2005) (quoting Munford, Inc. v. Fleming, 597 So.2d 1282, 1284 (Miss.1992)). We will reverse only if the evidence "points so overwhelmingly in favor of the moving party [in this case, Cash] that reasonable jurors" could not have found in favor of the non-moving party. Id.
¶ 5. At trial, Cash argued that Neely's employment was terminated because he was a poor employee who neglected to follow direct instructions given by his superior. Among other things, Cash argued that Neely failed to perform required evaluations, failed to prepare weekly reports, failed to do daily sales calls, and refused to follow orders given to him by Cash's CEO, Danny Cash.[3] Another factor alleged as part of the reason for Neely's termination was the finding of out-of-date beer on another employee's route.[4] On appeal, Cash argues that the judgment in this case should be reversed because Neely failed to refute all these age-neutral reasons for his termination.[5] Neely responds that the *322 out-of-date beer was initially used as a pretext for Neely's termination,[6] and that Cash later fabricated the reason that Neely was a poor employee after Neely filed his lawsuit against Cash.
¶ 6. We find that Neely produced substantial evidence from which the jury could have inferred that Danny wanted to fire Neely due to Neely's age.[7] The responsibility of determining what evidence is credible and what is not is the proper province of the jury. Doe v. Stegall, 757 So.2d 201, 205 (¶ 12) (Miss.2000) (citing Jackson v. Daley, 739 So.2d 1031, 1039 (¶ 29) (Miss.1999)). After hearing all the evidence presented by both Cash and Neely, the jury chose to decide in favor of Neely. We find our reliance on the judgment of the jury substantiated by a United States Supreme Court case addressing an ADEA claim, Reeves v. Sanderson Plumbing Prod's, Inc., 530 U.S. 133, 153, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). In that case, after the Fifth Circuit reversed a jury award in favor of the plaintiff, the Supreme Court stated that "the Court of Appeals impermissibly substituted its judgment concerning the weight of the evidence for the jury's." Id. Given the evidence presented in the case sub judice, we find that reversal would require us to also impermissibly substitute our judgment for the jury's.
¶ 7. Cash argues that Neely must specifically rebut each age-neutral reason given by Cash for Neely's termination. We look to Reeves once more for guidance. Reeves holds that, once a plaintiff has established a prima facie case of discrimination (which Neely did), the burden shifts to the defendant to establish a non-discriminatory *323 reason for termination (which Cash did). Id. at 142, 120 S.Ct. 2097 (citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Once the defendant has established a non-discriminatory reason, the burden is on the plaintiff to show that the "reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Id. at 143, 120 S.Ct. 2097 (quoting Burdine, 450 U.S. at 253, 101 S.Ct. 1089). In other words, the plaintiff "may attempt to establish that he was the victim of intentional discrimination `by showing that the employer's proffered explanation is unworthy of credence.'" Id. (citing Burdine, 450 U.S. at 256, 101 S.Ct. 1089).
¶ 8. Although Neely did not rebut each of Cash's offered non-discriminatory reasons by proving that he did not do them, he did present evidence that other younger employees, guilty of the same infractions, received far different treatment. We also note that the Mississippi Employment Security Commission, when considering Neely's claim for unemployment benefits, specifically found that "[t]he team leader over the driver who was under [Neely's] supervision was not discharged, but did have the same responsibilities of making sure that the products were routed within the company's expiration period." This unequal treatment goes directly to the credibility of Cash's non-discriminatory reasons. The court explained in Reeves that "the trier of fact can reasonably infer from the falsity of the explanation [for termination of employment] that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as `affirmative evidence of guilt.'" Id. at 147, 120 S.Ct. 2097. The unequal treatment combined with other evidence presented by Neely, such as his success at his job and impeachment of Cash's witnesses,[8] was sufficient for the jury to find that Cash's non-discriminatory reasons were mere pretextual. We note that the jury was instructed that Neely "must show by a preponderance of the evidence that each of the employer's `age neutral' stated reasons are pretextual or false." Even after having been so instructed, the jury found in favor of Neely, lending support for the notion that the jury clearly believed that each of the non-discriminatory reasons offered by Cash for Neely's termination had been rebutted.
¶ 9. Our study of the record does not show that the jury's decision was so contrary to the evidence that no reasonable jury could have come to that conclusion. Cash's first issue is without merit.
(2) Setoff
¶ 10. In its second issue, Cash argues that it should be entitled to a setoff of $208,896.66 against Neely's judgment because of the actual retirement benefits received by Neely after his termination. Whether Cash is entitled to a setoff is a question of law; therefore, we review the trial judge's decision, denying a setoff, de novo.
*324 ¶ 11. In Rhodes v. Guiberson Oil Tools, 82 F.3d 615, 620 (5th Cir.1996), the Fifth Circuit expressly stated that "[t]he present value of a plaintiff's interest in a pension plan is recoverable as an element of damages under the ADEA." Id. (citing Hukkanen v. Int'l Union of Operating Eng'rs, 3 F.3d 281, 286-87 (8th Cir.1993); Loeb v. Textron, Inc., 600 F.2d 1003, 1021 (1st Cir.1979)). In other words, Neely was clearly entitled to receive the benefit of his pension plan.
¶ 12. The issue in Rhodes was deduction of pension money already paid from a total sum of pension money awarded. In Rhodes, the plaintiff estimated the value of his pension plan, had it been received at age sixty-five. The court held that the present value of that amount should be awarded to the plaintiff, with the amount of pension money already paid deducted. Id. at 620-21. For example, if the plaintiff was entitled to $500,000 (the value of his pension plan when he was terminated plus the value of the plan from termination to age sixty-five), and the plaintiff had already been paid $200,000 by his former employer for the value of the pension plan at termination, the plaintiff would be unjustly enriched by $200,000 if he were awarded the full $500,000. In that situation, a deduction or credit would have to be made for the $200,000 already paid.
¶ 13. In the present case, Neely did not request, and the jury did not award, any damages for lost pension. The $120,000 awarded to Neely was solely for back pay. Since Neely is entitled to receive the value of his pension plan as of termination ($208,896.66) as well as back pay, there is no justification for deducting the previously-paid pension amount from the jury award. Cash would be entitled to a credit or deduction against the jury award only if Neely had received damages for loss of pension. That did not occur in this case. Accordingly, we find that Cash is not entitled to any setoff. Cash's second issue is therefore without merit.
B. Issues on Cross-Appeal
(1) New trial on damages or additur to verdict
¶ 14. Mississippi Code Annotated section 11-1-55 states:
The supreme court or any other court of record in a case in which money damages were awarded may overrule a motion for new trial or affirm on direct or cross appeal, upon condition of an additur or remittitur, if the court finds that the damages are excessive or inadequate for the reason that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence. If such additur or remittitur be not accepted then the court may direct a new trial on damages only. If the additur or remittitur is accepted and the other party perfects a direct appeal, then the party accepting the additur or remittitur shall have the right to cross appeal for the purpose of reversing the action of the court in regard to the additur or remittitur.
Miss.Code Ann. § 11-1-55 (Rev.2002). In other words, we may order an additur if we find that the damages awarded to Neely were inadequate because the jury was "influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of the credible evidence."
¶ 15. The decision of whether to grant an additur or remittitur is determined on a "case-by-case basis." Entergy Mississippi, Inc. v. Bolden, 854 So.2d 1051, 1058 (¶ 20) (Miss.2003) (citing Biloxi Elec. Co. v. Thorn, 264 So.2d 404, 405 *325 (Miss.1972)). "We will not disturb a jury's award of damages unless its size, in comparison to the actual amount of damage, shocks the conscience." Id. (citing City of Jackson v. Locklar, 431 So.2d 475, 481 (Miss.1983)). When reviewing the decision of the lower court, we will not reverse unless we find that there was an abuse of discretion on the part of the trial judge in denying an additur. Id. (citing Odom v. Roberts, 606 So.2d 114, 121 (Miss.1992)).
¶ 16. Neely, as the party seeking an additur, bears the burden of proving that an additur is required. We view the evidence in the case in a light most favorable to Cash when determining whether an additur is required. Gaines v. K-Mart Corp., 860 So.2d 1214, 1220 (¶ 21) (Miss.2003) (citing Rodgers v. Pascagoula Pub. Sch. Dist., 611 So.2d 942, 945 (Miss. 1992)).
¶ 17. Neely argues that we should order an additur because the jury's award was against the overwhelming weight of the uncontradicted evidence of his damages. Neely points out that Cash admitted in its court filings that he was entitled to $178,754 in back pay if he won at trial. Neely further contends that he offered proof of lost retirement and insurance benefits that entitles him to an additional $54,000 in damages, for a total additur of $112,754. Therefore, Neely contends that we should grant an additur on either the basis of jury prejudice or a finding that the jury's award was against the overwhelming weight of the evidence.
¶ 18. After reviewing all the evidence available to us, we believe that the decision of the jury to award Neely only $120,000 in back pay was against the overwhelming weight of evidence, and therefore, we order an additur of $58,754.[9] This number reflects the difference between the actual amount awarded by the jury and the amount conceded as proper back pay by Cash itself in its trial brief. We also direct the court below, on remand, to grant additional additur in any amount necessary to make Neely whole, as long as that amount is supported by the evidence presented in the case. Cash will have ten days from the date of this judgment from which to appeal this additur.
¶ 19. In its trial brief, Cash carefully calculated Neely's wages and came to a figure of back pay of $178,754. After scouring the record, we can find no basis for the jury's award of only $120,000.[10] In its appeal brief, Cash offers a clearly incorrect mathematical explanation for the jury award. The jury in this case was instructed that back pay was to be awarded for *326 the period between March 3, 2000 (the date of Neely's termination), and February 14, 2004 (the date of trial). Contrary to Cash's assertion that Neely is entitled to thirty-five months of back pay, the period of entitlement is forty-seven months. Therefore, we find no basis in the evidence for the amount awarded by the jury, and order an additur in the amount of $58,754 to make Neely whole, as required by the ADEA.
¶ 20. We also direct that the court below make a finding as to any additional additur that is required to make Neely whole. The jury in this case was clearly instructed to take into account not only lost wages, but other benefits, when awarding back pay: "if you find for the plaintiff, you shall award damages in the form of back pay . . . including lost wages and benefits (pension, insurance and vacation)." The additur we have ordered of $58,754 takes into account only the lost wages that were missing from the award of back pay. On remand, the court should consider what additur, if any, is required to reimburse Neely for lost insurance and vacation benefits.[11]
(2) All of Neely's other issues
¶ 21. Before addressing these issues, we emphasize the purpose of the ADEA, which is to make a successful plaintiff as whole as possible: "A primary remedial purpose of the ADEA is to make the individual victim of discrimination whole." Julian v. City of Houston, 314 F.3d 721, 728 (5th Cir.2002) (citing Reneau v. Wayne Griffin & Sons, Inc., 945 F.2d 869, 870 (5th Cir.1991)). In attempting to make a plaintiff whole, there are numerous remedies available, including back pay, front pay, lost benefits, prejudgment interest, post-judgment interest, attorney's fees and costs, reinstatement, and liquidated damages. Most of these damages (pre-judgment interest, post-judgment interest, and attorney's fees, for example) are determined by the judge after the jury has returned its verdict and award amount. The standard of review for the grant or denial of most of these remedies is abuse of discretion.
¶ 22. The court in the present case said very little in its order denying Neely's (and Cash's) post-trial motions. The language of the order, in its entirety, is as follows:
Comes now the Court in the above styled and numbered cause, upon the Plaintiff's Motions for New Trial on Damages or, in the Alternative for an Additur and Post-Trial Motions to Alter or Amend Judgment to Provide for Pre-Judgment Interest, for Front Pay, for an Award of Attorney Fees and Costs and for Post-Judgment Interest and the Defendant's Motion for an Offset, and the Court having reviewed arguments from counsel, finds that said motions should be denied. The parties shall have from the date of the filing of this order to perfect their appeal.[12]
There is no explanation in this order for the denial of additur, postjudgment interest, prejudgment interest, front pay, or attorney's fees (all of which are available remedies in order to make an ADEA plaintiff *327 whole). In his appeal, Neely alleges that the court below erred in denying him front pay, prejudgment interest, attorney's fees, and postjudgment interest. Due to the lack of information in the court's order explaining its decision, we reverse and remand to the trial court for further findings concerning its reasoning for denying all these remedies.
¶ 23. Front pay is an equitable remedy which is usually given when the ADEA's preferred remedy of reinstatement is impracticable. Tyler v. Union Oil Co. of California, 304 F.3d 379, 402 (5th Cir.2002). It is calculated from the date of judgment to the normal retirement age to compensate the plaintiff for wages and benefits he would have received in the future if not for the employee's termination. Id. In Julian, 314 F.3d at 728-29, the Fifth Circuit held that front pay should be awarded as long as reinstatement or instatement is not a feasible remedy: "In a failure to promote case, the preferred remedy is instatement to an illegally denied position, not reinstatement. If instatement is not feasible, however, front pay is the appropriate award." While Neely's case is not a failure to promote case, the reasoning behind this language in Julian is equally applicable to Neely's case. When instatement or reinstatement is not a feasible remedy, front pay should be awarded in order to make a successful plaintiff whole. The only exception to this that the Fifth Circuit notes is cases with "substantial liquidated damages." Id. at 729-30. Neely was awarded no liquidated damages, so there is no possibility that allowing an award of front pay will render his award of damages "inappropriate or excessive." Id. at 730. Although we are remanding this issue to the court below for further explanation and determination as to the propriety of an award of front pay, we note that reinstatement would seem to be an impossible remedy at this point: Neely is seeking front pay for the time between the close of trial and his retirement at age sixty-five, a time that has come and passed during the course of this appeal. We realize that it is at the discretion of the trial court to award front pay, but without any explanation before us as to the court's reason for denying front pay, we find that it is impossible to determine whether the court abused its discretion in refusing to award Neely front pay.
¶ 24. Prejudgment interest is also a common remedy used to make an ADEA plaintiff whole. In this context, the Fifth Circuit has noted that: "an award of prejudgment interest is generally considered consistent with the purpose of the ADEA to make the plaintiff whole. . . ." Rhodes, 82 F.3d at 623-24. Prejudgment interest is generally denied when a plaintiff is awarded liquidated damages. "In an ADEA case where liquidated damages are awarded, a court may not award prejudgment interest. . . ." McCann v. Texas City Ref., Inc., 984 F.2d 667, 673 (5th Cir.1993). The Fifth Circuit also noted in Rhodes that "the decision whether to award prejudgment interest is within the sound discretion of the [lower] court." Rhodes, 82 F.3d at 624. In Rhodes, however, it is clear that the lower court had specifically found that the plaintiff was made whole without the grant of prejudgment interest. "The district court found that Rhodes was made whole without an award of prejudgment interest." Id. (emphasis added). Therefore, we reverse and remand the trial court's denial of prejudgment interest. On remand, the trial court should consider whether prejudgment interest is required to make Neely whole, consistent with the remedial purposes of the ADEA.
¶ 25. The Fifth Circuit has strongly suggested that reasonable attorney's fees and costs should be awarded to a successful *328 ADEA plaintiff. "The ADEA, by reference to the FLSA, mandates that a district court award attorneys' fees to a plaintiff who is a `prevailing party.' The court has discretion in deciding what is reasonable." Tyler, 304 F.3d at 404 (citing Purcell v. Seguin State Bank & Trust Co., 999 F.2d 950, 961 (5th Cir.1993)). Given this strong and seemingly unambiguous language from the Fifth Circuit, we strongly suggest that, on remand, the trial court give serious consideration to whether attorney's fees should be awarded to Neely to make him whole. The court should also consider what costs of litigation, if any, should be awarded to Neely as damages in order to satisfy the remedial purposes of the ADEA.
¶ 26. Post-judgment interest on the jury's award is required by Mississippi statutory law: "All other judgments or decrees shall bear interest at a per annum rate set by the judge hearing the complaint from a date determined by such judge to be fair but in no event prior to the filing of the complaint." Miss.Code Ann. § 75-17-7 (Rev.2000). Cash argues that the language "to be fair" indicates that the grant or denial of post-judgment interest is solely at the judge's discretion. We disagree; the "to be fair" qualifies the date used for awarding interest. It does not clothe the trial judge with the discretion to award or not to award interest. The language of the statute indicates that post-judgment interest should be given, at a rate subject to the discretion of the court. On remand, the trial judge shall award post-judgment interest in the amount he deems appropriate in this case.
¶ 27. In summary, we affirm the decision of the court below as to Cash's direct appeal. We also affirm the court's decision regarding the first issue in Neely's cross-appeal, provided that an additur in the amount of $58,754 is accepted by Cash. We reverse the trial court's denial of Neely's post-trial motion, seeking prejudgment and post-judgment interest, loss of insurance benefits, front pay, and attorney's fees and remand for further proceedings consistent with this opinion. If Cash refuses to accept the additur ordered herein, the trial court shall grant Neely a new trial on damages only.
¶ 28. THE JUDGMENT OF THE CIRCUIT COURT OF LOWNDES COUNTY IS AFFIRMED ON DIRECT APPEAL, AND AFFIRMED IN PART, AND REVERSED AND REMANDED IN PART ON CROSS-APPEAL. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.J., AND ISHEE, J., CONCUR. GRIFFIS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER AND BARNES, JJ.
GRIFFIS, J., dissenting.
¶ 29 I respectfully dissent from the majority's conclusion on issue A.1. I would reverse and render the judgment.
¶ 30. The only claim tried was Neely's federal law claim that Cash violated the federal Age Discrimination in Employment Act, 29 U.S.C. § 621-634. Thus, the evidence must support the claim that Cash unlawfully terminated Neely's employment due to his age. I find that there was insufficient evidence for the jury to conclude that Neely's termination was discriminatory. Thus, under Reeves v. Sanderson Plumbing Prod's, Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), Cash Distributing Company, Inc. was entitled to judgment as a matter of law because the record conclusively revealed other, age-neutral, nondiscriminatory reasons for Neely's termination.
*329 ¶ 31. My review is in two parts. First, I will review the "substantial evidence" of age discrimination offered by the majority. Second, I will make my analysis of this case under Reeves and the framework set forth by the federal courts.
¶ 32. The majority finds "that Neely produced substantial evidence from which the jury could have inferred that Danny [Cash] wanted to fire Neely due to his age." This question is the essence of any age discrimination case. My concern with this conclusion by the majority is that there was absolutely no evidence that Danny Cash "wanted to fire Neely due to his age." Indeed, Danny Cash testified about numerous reasons for Neely's termination. None of the reasons were age related. Instead, all of the reasons for his termination were age neutral. Neither Neely nor the witnesses he offered disputed each of the reasons given by Danny Cash. Indeed, Neely admitted that he failed, ignored or refused to follow the specific orders and directives of his employer.
¶ 33. Instead, Neely's entire case goes to pretext. Neely attempted to infer that Cash had an ill motive in its sweep to find out-of-date beer on one of the routes for which Neely was responsible. Neely even testified that he (Neely) believed that Danny Cash believed that his age-neutral reasons for termination were true. There was an abundance of evidence of Neely's repeated and continuing insubordination toward his superior, Danny Cash. Neely admitted this fact and presented no evidence to rebut Cash's claim of insubordination.
¶ 34. I am also concerned with the substantial evidence upon which the majority relies. In note 7, the majority itemizes the substantial evidence that it claims supports the jury's verdict. Almost all of the issues cited by the majority are age-neutral on their face. The remaining issues are age-neutral when reviewed in context. The evidence cited by the majority simply does not support a verdict of age discrimination.
¶ 35. The majority's substantial evidence begins with the finding that "Neely pointed out that Danny Cash was the only person against Neely's promotion to general manager in 1996." I fail to see how this fact can possibly support a finding of unlawful age discrimination. Neely got the promotion. Any vote by Danny Cash, in 1996, did not affect Neely's employment in 2000. The fact that Danny Cash did not vote to give Neely the promotion, in 1996, cannot infer any unlawful age discrimination in 2000. Neely offered no evidence that the 1996 vote was an adverse employment action that was taken by Cash due to Neely's age. It is certainly not close in time to Neely's termination. In my opinion, this fact is not evidence of unlawful age discrimination.
¶ 36. Second, the majority concludes that the 1998 memo, written by Danny Cash, implied "that Neely had his job on the basis of seniority and not ability." The memo was styled "August 98 Assessment." The memo was written to Neely. Under the heading "Areas that need continuing monitoring," the pertinent part of the memo reads:
I have been thinking about the evaluation process and have determined that with the time invested in communications so far, we can go to quarterly reviews for all employees except salesmen and new employees. The salesmen should still be evaluated each month to cover impact, route books, sales, promotions, etc. New employees should be evaluated each month for the first six months then quarterly. This does not mean that communication between managers should decrease, only the need for a formal sit down evaluation. The quarterly evaluations should be far more indepth *330 than a 1-10 rating. I would like to see job specific questions and an area including what have you learned to do over and above your present position to provide more value and who have you trained to complete what tasks you are responsible for. In order to provide more value vs. "twenty years of service" the positions need to keep adding abilities not seniority. This is not a social security system. We need to use the evaluations to show each employee the total cost to the company vs. their take home pay. Also, when would be the best time to complete the evaluations? The end of each quarter or the last month of the quarter to discuss current quarter standings and plan the next quarter.
Neely signed this memo on September 2, 1998. Neely was terminated on March 3, 2000, approximately eighteen months after this memo was received.
¶ 37. The context of this memo is that Cash's employees are expected to perform their job assignments, and managers, such as Neely, are required to provide regular and detailed evaluations. These words were not directed to or just about Neely. This is not evidence from which one could infer that Danny Cash believed Neely was of social security age. Instead, in the memo, Danny Cash discussed Neely's managerial responsibility to prepare a regular, accurate and in-depth evaluation of the employees who reported to him. Danny Cash testified that the use of the words "social security" was not a reference to Neely's age or any intent of Cash to discriminate against Neely because of his age. Instead, Danny Cash demanded that Neely prepare timely evaluations on all employees, and Danny wanted all of the employees to be conscious of their responsibilities and job duties at Cash. Even Neely's testimony does not support the majority's finding. During redirect examination, Neely testified as follows:
Q. Read the last sentence starting on the bottom of that page, Mr. Neely.
A. "In order to provide more value vs. "twenty years of service" the positions need to keep adding abilities not seniority. This is not a social security system."
Q. Is the twenty years of service in quotes?
A. Yes, it is.
Q. How did you take that comment on this assessment, Mr. Neely?
A. That just  as I had heard several times, just because had you been there a long time, it didn't mean much.
Q. You were under the impression that  what impression did he give you as far as your age having anything to do with your job, Mr. Neely?
A. That I was what I knew I was, expendable.
On cross-examination, Danny Cash testified:
Q. [question referring to another document] You're comparing Mr. Neely to another old man saying that this other old man is doing his job okay, but this old man, Mr. Neely, he's not doing the job the way I want it. It's just an old man. Isn't that what you thought?
A. No, sir, I disagree. I never referred to Mr. Neely as an old man in any document I ever presented him.
Q. What about the August 1998 assessment where you mocked his twenty years of service and referring to Social Security, Mr. Cash?
A. No, sir. I was not mocking his twenty years of service.

*331 Q. Why would you put twenty years of service in quotes about "value vs. twenty years of service,"
A. My feeling is an honest day's pay for an honest day's work. They are paid each and every Friday for the work they conduct each and every week.
¶ 38. Danny Cash, Neely and others testified about the new agreement between Cash and Anheuser-Busch. Each of them testified that the new agreement required more from distributors, like Cash, than what Anheuser-Busch had required in the past. Danny Cash believed that Anheuser-Busch viewed him, and his family's company, as expendable. Rather than be replaced by Anheuser-Busch, Danny Cash managed the company to comply with terms of the new agreement.
¶ 39. Danny Cash also testified that the social security analogy was a reference to Anheuser-Busch's new method of preparing evaluations as opposed to the method used in the past, when he testified: "Anheuser-Busch had come out with a new assessment rating. There were numerous additional requirements, and we were going to have to fulfill those obligations. We couldn't do things as they had always been done." The wording used in the August 1998 memo, when read in context and considered with the testimony of Neely and Danny Cash, does not present evidence of unlawful age discrimination.
¶ 40. Third, the July 2000 timeline document was prepared by Danny Cash after Neely was terminated and in preparation for a hearing before the Mississippi Employment Security Commission. The question there was whether Neely was entitled to unemployment benefits as a result of his termination. The portion of the July 2000 document states that Tony Carley "was later promoted to supervisor and actually did most of the work for the other two much older supervisors that were riding their time out." Danny Cash testified that Neely was not one of the "two much older supervisors" that were referred to in this document. Since Neely was not the subject of this reference and it was prepared after Neely's termination, this statement in the July 2000 timeline is not evidence of unlawful age discrimination against Neely.
¶ 41. The fourth issue relates to the question of out-of-date beer. Danny Cash testified that this was the "straw that broke the camel's back" and, finally, caused Neely's termination. Neely claims that this was a pretext for age discrimination. The majority has determined that the out-of-date beer is substantial evidence of age discrimination because it "was not uncommon and was regularly turned in by Cash's employees." The majority's characterization of this evidence indicates that an inference of age discrimination comes from the fact that no one else was fired because of the out-of-date beer infraction. The interesting point of this argument is that Neely does not deny that a substantial amount of out-of-date beer was found on a route for which he was responsible. Neely does not deny that he was ultimately responsible for this problem to his employer. No one argued that this was the sole reason for Neely's termination. The fact that a substantial amount of out-of-date beer was found on one of the routes for which Neely was responsible does not evidence unlawful age discrimination. The claim that others were not terminated for having substantially less out-of-date beer on the routes for which they were responsible does not evidence unlawful age discrimination toward Neely.
¶ 42. Next, the majority also refers to the hiring of Dennis Klier. The majority concludes that there was circumstantial evidence that Klier was hired to help Danny *332 Cash fire Neely. Even if that were true, that evidence provides absolutely no support for a claim for unlawful age discrimination. Klier was hired as Executive Vice President. His responsibilities were over the entire company and included Columbus and Tupelo. There was evidence that Klier's employment was required by Anheuser-Busch. The Anheuser-Busch agreement required that a qualified person be appointed the successor equity owner of Cash. Klier was brought in to take over Cash if something happened to Danny Cash, so that a knowledgeable person could continue to own and operate the Anheuser-Busch distributorship. This fact does not support a claim of unlawful age discrimination.
¶ 43. The majority also claims that substantial evidence of age discrimination comes from the fact that Klier required that Neely arrive at work earlier than in the past, 6:30 a.m. instead of 8:00 a.m., and that Neely ride on a truck despite his bad back. Neither of these facts are evidence of unlawful age discrimination.
¶ 44. Finally, the majority's states that Neely "was replaced with a gentleman who was more than twenty years younger than he." There was contradictory evidence on this fact. Danny and others testified that Neely's duties were actually spread among several other employees, some of whom were at or near Neely's age. Nevertheless, accepting this fact as correct, the replacement of an employee by someone younger does not in and of itself make out a claim of unlawful age discrimination. Instead, it is but one factor which must be proven to establish a prima facie case of age discrimination. Machinchick v. PB Power, Inc., 398 F.3d 345, 350 (5th Cir. 2005).
¶ 45. After reviewing the transcript and record, I cannot come to the same conclusion as the majority. I am of the opinion that there was not sufficient evidence of unlawful age discrimination. Neely testified that Danny Cash's management style was dictated by Anheuser-Busch. There was evidence that the new agreement that Cash entered into with Anheuser-Busch required more detailed documentation by Cash's employees. Neely never testified that he thought he was fired because of his age. Neely never even testified about the reason he thought he was fired. Instead, he relied on documents and the testimony of other witnesses. None of the witnesses testified that he believed Neely was terminated because of his age. None of the documents, when read in context, evidence unlawful age discrimination.
¶ 46. As the majority recognizes, there was substantial testimony about several other reasons for Neely's termination. Neely failed to prepare the evaluations as he was directed by Danny Cash. Neely failed to make and document daily sales calls. Neely failed to prepare weekly activity reports. Neely failed to prepare the documentation necessary to prevent the allowance of out-of-date beer in the market, when Anheuser-Busch had a zero-tolerance for out-of-date beer. More importantly, there was much evidence Neely "flat[ly] refused to follow the orders" of his superior Danny Cash.[13] Neely did not contest these age-neutral reasons that were articulated to support his termination. Indeed, Neely admitted that most if not all *333 these reasons were true. He directly admitted that he had failed to follow, refused or ignored the specific directives and instructions of his employer and his direct supervisor, Danny Cash. During the trial, Neely did not dispute these age-neutral reasons for his termination. Instead, Neely only claimed that the company did well on its review and he suffered from more intense scrutiny and unequal treatment for the out-of-date beer discovery than any other employee. It is not unreasonable for general managers to suffer more intense scrutiny, and the fact that the owner has high expectations for production and low tolerance for mistakes from its upper management does not evidence age discrimination. When Neely's termination occurred, Neely walked in to a meeting with Cash, and Cash told him that his services were no longer needed. Neely promptly left. No other witnesses testified that they thought Cash fired Neely because of his age.
¶ 47. Now, I move to my analysis of this case under Reeves and the framework set forth by the federal courts.
¶ 48. Neely's claim for age discrimination is governed by federal law. We must follow the federal court's interpretations when considering the appeal of a claim for age discrimination. Columbus Paper & Chemical, Inc. v. Chamberlin, 687 So.2d 1143, 1147-50 (Miss.1996). Age discrimination may be brought in either state or federal courts, 29 U.S.C § 626(c)(1), but are more commonly litigated in the federal courts, where such claims are routine.
¶ 49. Neely argues that he submitted direct and circumstantial evidence of Cash's age based animus more than sufficient to rebut Cash's proffered age-neutral reason for terminating him. In essence, Neely argues that the age-neutral reasons offered to justify Neely's termination were pre-textual. Neely cites Reeves for the following rules: (1) whether or not an asserted reason for his termination is pretext is simply a fact issue, and (2) to give rise to an inference of discrimination, the employee must provide some evidence, either direct or circumstantial, to rebut the employer's explanation for termination.
¶ 50. In Reeves, the question presented to the Supreme Court was "whether a defendant is entitled to judgment as a matter of law when the plaintiff's case consists exclusively of a prima facie case of discrimination and sufficient evidence for the trier of fact to disbelieve the defendant's legitimate, nondiscriminatory explanation for its action. We must also decide whether the employer was entitled to judgment as a matter of law under the particular circumstances presented here." Reeves, 530 U.S. at 137, 120 S.Ct. 2097.
¶ 51. Roger Reeves was 57 and had been employed by Sanderson Plumbing Products, Inc., for 40 years. Id. He was responsible for recording the attendance of the employees that he supervised. Based on information from a coworker that production was down in Reeves' are of supervision, Powe Chesnut, Sanderson's director of manufacturing, conducted a review of the attendance records. Id. at 138, 120 S.Ct. 2097. Chesnut determined that there were errors in the administration of Sanderson's attendance records. As a result, Reeves and another employee were fired. Id. Reeves brought an ADEA claim in federal court. Sanderson answered claiming that Reeves was fired for his failure to maintain accurate attendance records. Id. Reeves claimed that Sanderson's reasons for his termination were simply pretext for age discrimination. Id.
¶ 52. Reeves offered evidence that "he had accurately recorded the attendance and hours of the employees under his supervision," and that Chesnut "had demonstrated age-based animus in his dealings *334 with" Reeves. Id. The jury awarded Reeves a judgment of $35,000 in compensatory damages and, after determining the jury found that the age discrimination was willful, the district court awarded liquidated damages of an additional $35,000. Id. Sanderson filed a motion for judgment notwithstanding the verdict or a new trial, which was denied. Id. at 139, 120 S.Ct. 2097. The Fifth Circuit reversed the jury's verdict and held that Reeves did not present "sufficient evidence to sustain the jury's finding of unlawful discrimination." Id.
¶ 53. The United States Supreme Court granted certiorari and addressed the issue of "whether a plaintiff's prima facie case of discrimination (as defined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)), combined with sufficient evidence for a reasonable factfinder to reject the employer's nondiscriminatory explanation for its decision, is adequate to sustain a finding of liability for intentional discrimination." Reeves, 530 U.S. at 140, 120 S.Ct. 2097. The court outlined the McDonnell Douglas framework as follows:
Under the ADEA, it is "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). When a plaintiff alleges disparate treatment, "liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision." That is, the plaintiff's age must have "actually played a role in (the employer's decision-making) process and had a determinative influence on the outcome." Recognizing that "the question facing triers of fact in discrimination cases is both sensitive and difficult," and that "[t]here will seldom be `eyewitness' testimony as to the employer's mental processes," the Courts of Appeals, including the Fifth Circuit in this case, have employed some variant of the framework articulated in McDonnell Douglas to analyze ADEA claims that are based principally on circumstantial evidence. This Court has not squarely addressed whether the McDonnell Douglas framework, developed to assess claims brought under § 703(a)(1) of Title VII of the Civil Rights Act of 1964, 78 Stat. 255, 42 U.S.C. § 2000e-2(a)(1), also applies to ADEA actions. Because the parties do not dispute the issue, we shall assume, arguendo, that the McDonnell Douglas framework is fully applicable here.

McDonnell Douglas and subsequent decisions have "established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases." First, the plaintiff must establish a prima facie case of discrimination. It is undisputed that petitioner satisfied this burden here: (i) at the time he was fired, he was a member of the class protected by the ADEA ("individuals who are at least 40 years of age," 29 U.S.C. § 631(a)), (ii) he was otherwise qualified for the position of Hinge Room supervisor, (iii) he was discharged by respondent, and (iv) respondent successively hired three persons in their thirties to fill petitioner's position. The burden therefore shifted to respondent to "produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." This burden is one of production, not persuasion; it "can involve no credibility assessment." Respondent met this burden by offering admissible evidence sufficient for the trier of fact to conclude that petitioner was fired because of his failure *335 to maintain accurate attendance records. Accordingly, "the McDonnell Douglas framework  with its presumptions and burdens"  disappeared, and the sole remaining issue was "discrimination vel non."
Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." And in attempting to satisfy this burden, the plaintiff  once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision  must be afforded the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination "by showing that the employer's proffered explanation is unworthy of credence." Moreover, although the presumption of discrimination "drops out of the picture" once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case "and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual."
Reeves, 530 U.S. at 141-43, 120 S.Ct. 2097 (citations omitted).
¶ 54. Sanderson offered Reeves' alleged "shoddy recordkeeping" and the testimony of Chesnut and Sanderson's president, who made the decision to fire Reeves. Id. at 143, 120 S.Ct. 2097. Sanderson's president testified that she accepted Chesnut's recommendation to fire Reeves believing that Reeves had "intentionally falsif[ied] company pay records." Id. at 144, 120 S.Ct. 2097. The falsification of pay records was the only reason given by Sanderson to support Reeves' termination.
¶ 55. Reeves introduced evidence that Sanderson's reason was false. Id. Reeves testified that the attendance records were accurate, consistent with company policy, and that his employees' time and attendance records were correct. Id. at 145, 120 S.Ct. 2097. He also presented evidence that company policy did not authorize him to discipline employees for attendance violations and that he did not report the one particular employee's absence, which was in issue, because Reeves was in the hospital that day and absent from work. Id.
¶ 56. The Fifth Circuit determined that a jury could have found Sanderson's reasoning for terminating Reeves to be pretextual, but it found that there was insufficient evidence that Reeves age motivated his termination. Id. at 146, 120 S.Ct. 2097. The Supreme Court determined that the Fifth Circuit "ignored the evidence supporting petitioner's prima facie case and challenging respondent's explanation for its decision." Id. The Supreme Court held:
In so reasoning, the Court of Appeals misconceived the evidentiary burden borne by plaintiffs who attempt to prove intentional discrimination through indirect evidence. This much is evident from our decision in St. Mary's Honor Center [v. Hicks]. There we held that the factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not compel judgment for the plaintiff. 509 U.S. [502], at 511, 113 S.Ct. 2742[, 125 L.Ed.2d 407 (1993)]. The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily *336 establish that the plaintiff's proffered reason . . . is correct." Id., at 524, 113 S.Ct. 2742. In other words, "[i]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." Id., at 519, 113 S.Ct. 2742.
In reaching this conclusion, however, we reasoned that it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. Specifically, we stated:
"The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." Id., at 511, 113 S.Ct. 2742.
Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. See id., at 517, 113 S.Ct. 2742 ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination"). In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Cf. Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) ("[W]hen all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts with some reason, based his decision on an impermissible consideration"). Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.
This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. See Aka v. Washington Hospital Center, 156 F.3d [1284], at 1291-1292 [(C.A.D.C.1998)]; see also Fisher v. Vassar College, 114 F.3d [1332], at 1338 [(C.A.2 1997)] ("[I]f the circumstances *337 show that the defendant gave the false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent"). To hold otherwise would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50, and we have reiterated that trial courts should not "`treat discrimination differently from other ultimate questions of fact.'" St. Mary's Honor Center, supra, at 524, 113 S.Ct. 2742 (quoting [U.S. Postal Service Bd. of Governors v.] Aikens, 460 U.S. [711], at 716, 103 S.Ct. 1478[, 75 L.Ed.2d 403 (1983)]).
Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law. See infra, at 2110-2111. For purposes of this case, we need not  and could not  resolve all of the circumstances in which such factors would entitle an employer to judgment as a matter of law. It suffices to say that, because a prima facie case and sufficient evidence to reject the employer's explanation may permit a finding of liability, the Court of Appeals erred in proceeding from the premise that a plaintiff must always introduce additional, independent evidence of discrimination.
Reeves, 530 U.S. at 146-49, 120 S.Ct. 2097 (emphasis added).
¶ 57. The emphasized language in the preceding paragraph is the basis for my decision. I also believe it is what distinguishes this case from Reeves. Here, each of Cash's reasons for termination have not been proven false. Indeed, Neely only attacked one of many reasons that were given to justify Neely's termination. As discussed below, the standard of review does not require that we draw reasonable inferences in favor of Neely when he failed to rebut evidence of the other reasons for his termination.
¶ 58. In Reeves, the Supreme Court also considered the appropriate standard of review for a judgment as a matter of law. "Under Rule 50, a court should render judgment as a matter of law when `a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.' Fed. Rule Civ. Proc. 50(a)." Reeves, 530 U.S. at 149, 120 S.Ct. 2097. The Court recognized the rule that appellate courts are to draw reasonable inferences in favor of the nonmovant and not make credibility determinations or reweigh the evidence. However, the Court held that although it "must disregard all evidence favorable to the moving party that the jury is not required to believe. . . . [T]he court should give credence to the evidence favoring the nonmovant as well as that `evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Id. at 151, 120 S.Ct. 2097.
¶ 59. Applying this standard, the Supreme Court determined that Sanderson was not entitled to a judgment as a matter of law. Id. The Court found that Reeves established a prima facie case of discrimination and created a jury issue as to Sanderson's false explanation. Id. In addition, the court found that Reeves:
introduced additional evidence that Chesnut was motivated by age-based animus and was principally responsible for petitioner's firing. [Reeves] testified that Chesnut had told him that he "was *338 so old [he] must have come over on the Mayflower" and, on one occasion when petitioner was having difficulty starting a machine, that he "was too damn old to do [his] job. . . ." According to [Reeves], Chesnut would regularly "cuss at me and shake his finger in my face." . . . Oswalt, roughly 24 years younger than petitioner, corroborated that there was an "obvious difference" in how Chesnut treated them. . . . He stated that, although he and Chesnut "had [their] differences," "it was nothing compared to the way [Chesnut] treated Roger." . . . Oswalt explained that Chesnut "tolerated quite a bit" from him even though he "defied" Chesnut "quite often," but that Chesnut treated [Reeves] "[i]n a manner, as you would . . . treat . . . a child when . . . you're angry with [him]." . . . [Reeves] also demonstrated that, according to company records, he and Oswalt had nearly identical rates of productivity in 1993. . . . Yet [Sanderson] conducted an efficiency study of only the regular line, supervised by petitioner, and placed only petitioner on probation. . . . Chesnut conducted that efficiency study and, after having testified to the contrary on direct examination, acknowledged on cross-examination that he had recommended that petitioner be placed on probation following the study.
Id. at 151, 120 S.Ct. 2097. The Supreme Court determined that the Fifth Circuit failed to draw reasonable inferences in favor of Reeves. Id. at 152, 120 S.Ct. 2097. The Court reasoned "[f]or instance, while acknowledging `the potentially damning nature' of Chesnut's age-related comments, the [Fifth Circuit] discounted them on the ground that they `were not made in the direct context of Reeves's termination.'" Id. The Court, thus, determined that the Fifth Circuit substituted its judgment concerning the weight of the evidence for the jury's. The court recognized that the "ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." Id. at 153, 120 S.Ct. 2097.
¶ 60. Reeves can be distinguished from this case. Here, Neely argues that the out-of-date beer reason for his termination was false. Neely claims that he was not the only member of management that had been on this route before the discovery of the out-of-date beer. Next, he argues that the salesman/driver did a good job hiding the out-of-date beer. He also claims that another younger employee, Tony Carley, was not terminated when out-of-date beer was discovered on two of his salesmen's routes. He also says that out-of-date beer was a common problem and always would be. His final argument is that because Cash proffered a reason that was new and different than out-of-date beer in an effort to justify its decision to terminate him. Under the standard of review, we must accept that the jury resolved the out-of-date beer issue in favor of Neely and determined that the out-of-date beer reason was false. This establishes a minimum level of pretext. What separates this case from Revees is that there is nothing about the jury's finding that establishes that Neely's termination was discriminatory. Instead, the Reeves court held that:
[t]he ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct." . . . In other words, "[i]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination."
Reeves, 530 U.S. at 146-47, 120 S.Ct. 2097. Hence, we must consider the evidence that *339 supports the finding of unlawful age discrimination.
¶ 61. There was no testimony that Danny Cash ever uttered words like Chesnut said toward Reeves. See Id. at 151, 120 S.Ct. 2097 (Chesnut said Reeves "was so old [he] must have come over on the Mayflower" and Reeves "was too damn old to do [his] job"). The oral and documentary evidence did not support an inference that Neely was ever the subject of any direct reference to his age. However, Neely's counsel argues that there were indirect references to Neely's age.
¶ 62. First, in the July 2000 timeline document, Neely's counsel repeatedly makes reference to the words "riding time." The memo was prepared by Danny Cash after Neely was terminated. The pertinent part of this memo reads:
Tony Carley started working for Coors when they first came to Columbus. He was a salesman with them. He kept trying to work for us, but he was a friend of my brother and Granddaddy was hesitant. He was finally given a chance and became one of if not the top salesman. He was later promoted to supervisor and actually did most of the work for the other two much older supervisors that were riding their time out. Tony won numerous contests and was praised by the brewery. Tony was promoted to sales manager at the same time Jim was promoted to general manager in early 1996.
(Emphasis added). The subject of this comment was Carley not Neely. The "two much older supervisors" was not referring to Neely. The time frame that was referred to was 1996, which was four years before Neely's termination. The memo contrasts Carley's success as a supervisor against two supervisors who were apparently complacent. This memo was never seen by Neely, until it was produced as part of this litigation. This comment was remote in time, it does not refer to Neely, and it does not support a finding of age-based animus by Cash which was responsible for Neely's termination.
¶ 63. Next, Neely's counsel argues that there was the use of the terms "crippled fingers" in the same July 2000 document. The pertinent part reads:
The general sales manager in Tupelo develops contests, types his own evaluations, leads sales meetings and manager meetings, fills out all required documentation as requested. I had previously asked Jim to type some of the information he hand wrote, but his crippled fingers would not let him. A few months later he had gotten an internet account at home and joined a chat club. Miracles do happen. He never typed anything at work and never used a computer to generate sales reports himself. The general sales manager in Tupelo, who is an older man, designs his own forms and creates numerous items on the computer. Jim never wanted to learn how to use the ones we had at work.
Danny Cash testified that Neely himself used the words "crippled fingers" to explain why Neely said he could not type some information at work. Danny Cash's use of these words were to simply restate how Neely had previously described himself and his condition. This was part of Neely's reasoning behind not using computers at work. Again, this memo was never seen by Neely until it was produced as part of this litigation. There was no evidence that Danny Cash made an employment decision based on Neely's crippled fingers. These words do not support a finding of age-based animus which was responsible for Neely's termination.
¶ 64. Neely also argues that the July 2000 memo evidences age discrimination *340 through the use of the words "The general sales manager in Tupelo, who is an older man, designs his own forms and creates numerous items on the computer." Neely was not the subject of this comment. Instead, this comment is about Tim Hale, and it discusses the fact that Hale has the ability to use technology to complete his job duties. The use of the words "older man" here was referring to a fact that Hale's birthday was December 26, 1952, and it was a compliment to Hale for his ability to use technology. This comment does not support a finding of age-based animus which was responsible for Neely's termination.
¶ 65. As discussed above, Neely never testified that he thought he was fired because of his age. Neely never even testified about the reason he thought he was fired. Instead, he relied on his counsel's characterization of oral and documentary evidence. None of the witnesses testified that they believed Neely was terminated because of his age. Yet, Neely even admitted that he was insubordinate and that he failed to prepare the documentation that was required. Neely did not even challenge the claim that he "flat[ly] refused to follow the orders" of his employer. Unlike Reeves, Neely failed to present any additional evidence that Cash "was motivated by age-based animus and was principally responsible for petitioner's firing." Reeves, 530 U.S. at 151, 120 S.Ct. 2097.
¶ 66. I am persuaded that the following portion of the Reeves opinion requires a result here that is different than the Reeves result.
Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Cf. Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) ("[W]hen all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts with some reason, based his decision on an impermissible consideration"). Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.
This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.
Reeves, 530 U.S. at 147-48, 120 S.Ct. 2097.
¶ 67. Here, the legitimate reason for Neely's termination  insubordination  was never eliminated. I conclude that no rational finder of fact could conclude that Neely's termination was based on his age and thus unlawful age discrimination. Neely never rebutted the claim of insubordination and did not testify that he had the subjective belief that he was unlawfully terminated due to his age. Therefore, I am of the opinion that Cash Distributing Company, Inc. was entitled to judgment as *341 a matter of law because the record conclusively revealed that Neely's insubordination was a nondiscriminatory reason for Cash's decision.
CHANDLER AND BARNES, JJ., JOIN THIS SEPARATE OPINION.
NOTES
[1] Cash distributes Anheuser-Busch beer.
[2] Had the jury found that Cash's conduct was willful, Neely would have been able to pursue liquidated damages under the ADEA. Id. at § 626(b).
[3] We will refer to Danny Cash as simply "Danny" in order to avoid confusion.
[4] The beer that Cash distributes is all dated, and Anheuser-Busch has a zero-tolerance policy for out-of-date beer. Therefore, out-of-date beer is supposed to be discovered and removed from the market.
[5] Cash also seems to assert that Neely was fired simply because of a corporate reorganization, and that this reorganization was a substantial non-discriminatory reason for Neely's termination. We find this argument without merit. No witness, including Cash's acting president, testified that Neely was fired because of a corporate reorganization. The mere fact that reorganization occurred after Neely's termination is not sufficient. The original answer by Cash to Neely's complaint makes no mention of the corporate reorganization, and Cash's motion for summary judgment does not address any reorganization. The first time the reorganization is even mentioned as a reason is a brief sentence in Cash's motion for a judgment as a matter of law, after trial. Any evidence produced concerning the reorganization during witness testimony went to the jury and was taken into account by it in rendering its verdict.
[6] The Mississippi Employment Security Commission agreed with Neely, and stated in its findings of fact that "[the out-of-date beer] was an isolated incident." The Commission found that Neely had been discharged for unsatisfactory job performance, but did not find that Neely's actions rose to the level of "misconduct . . . as that term is used in the law."
[7] Neely proved that Danny was the only person against Neely's promotion to general manager in 1996. A 1998 memo from Danny to Neely informed Neely that Cash "is not a social security system" (implying that Neely had his job on the basis of seniority and not ability). When speaking of older employees in July 2000, Danny described those employees as "riding their time out." Danny testified at trial that that was his "train of thought" concerning Neely. Various witnesses testified that out-of-date beer  which formed the pretext for Neely's termination  was not uncommon and was regularly turned in by Cash's employees. Witness testimony also indicated that out-of-date beer was discovered on routes under the direction of other employees, none of whom were fired. Witness testimony further showed that other individuals guilty of the same out-of-date beer infraction as Neely were not fired. Neely produced circumstantial evidence that another employee, Dennis Klier, was hired to help Danny fire Neely. After Klier was hired, he required Neely to be at work at 6:30 a.m. instead of Neely's usual 8:00 a.m. time. Klier also requested that Neely ride on a truck during routine route checks, despite Klier's knowledge of Neely's bad back. After Neely was fired, he was replaced with an employee who was more than twenty years his junior.
[8] For example, Neely's attorney repeatedly pointed out and questioned witnesses about the last evaluation Cash received from Anheuser-Busch around the time of Neely's termination. In that evaluation, Cash achieved 38/38 and 10/10 possible points  in short, a perfect score. Neely's attorney also impeached one of Cash's witnesses by eliciting an admission from the witness that he, as equity successor to Danny, stood to gain much from Cash's continued success. Other witnesses were impeached by conflicting past testimony or writings.
[9] Neely urges that we could also find that the jury was prejudiced by remarks of Cash's counsel during closing argument regarding the setoff issue that was to be determined by the court post-trial. Since neither party's closing arguments have been preserved for the record, we do not accord this argument any significance. We do note, however, that Cash does not dispute having made such a remark during closing argument. Regardless of the remark by Cash's attorney, the amount awarded by the jury was clearly against the overwhelming weight of the evidence in this case.
[10] In a separate portion of its brief, Cash argues that Neely should not be entitled to any recovery at all because he failed to mitigate his damages. There was evidence presented to the jury that Neely waited two months before beginning his new employment after his termination from Cash. However, the two-month interval provides no reasonable justification for the jury's returning a verdict approximately $60,000 less than the $178,754 back pay figure which Cash admitted, in the trial court, that Neely would be entitled to if he prevailed. There is no evidence to support the notion that Neely could have earned approximately $60,000 in two months. Accordingly, we do not find that this difference could have been the result of a deduction for failure to mitigate.
[11] We recognize that Neely has requested an additional $54,000 for these damages. However, based on the record before us, we cannot adequately assess a proper amount for these items and thus remand to the trial court, who is in a much better position to accurately assess an amount for these items.
[12] This is actually the text of the court's amended order. The only difference between the original order and the amended order is that the amended order mentions Cash's motion for offset, whereas the original order mentions only Neely's motions.
[13] In an October 20, 1998 memo, Danny Cash told Neely that "[m]y biggest concern is your flat refusal to follow directions." Cash also warned "I really hope they [evaluations and daily time sheets] have been turned in due to the fact that with the evaluations not being completed as required, I will take this as a personal insult to my ownership of the company and will take actions to remedy the problem. . . . The brewery [Anheuser-Busch] sees me as replaceable. I see the need to prevent that."